## SAND SPRINGS HOME v. STATE.

No. 24151. Opinion Filed June 20, 1933.

Rehearing Denied March 27, 1934.

Application to File Second Petition for Rehearing Denied May 22, 1934.

C. B. Stuart and E. J. Doerner, for plaintiff in error.

R. E. Stephenson and Edwin A. Ellinghausen, for defendant in error.

OSBORN, J. This is an appeal from the county court of Creek county, and involves the right of the state to levy ad valorem taxes upon the property of the Sand Springs Home.

The cause originated when the tax ferret of Creek county served a notice on the officers of the Home to appear before the county treasurer and show cause why said property should not be extended on the county tax rolls. The Home filed a return to said notice, alleging that it was exclusively a charitable institution, had no stockholders, declared no dividends, and that no person profited by its operation. The parties will be referred to as they appeared in the trial court, which is inverse to their order here.

The county treasurer held that the property involved was taxable, defendants appealed to the county court, and after a hearing the court sustained the ruling of the treasurer, and ordered the property placed on the tax rolls, from which ruling the defendant has appealed.

The property involved is described as:

"One (8) unit gasoline plant including lines, buildings, resident houses, pipe lines, loading rack, R. R. spur, tank cars, wood and steel tanks and any and all other material used in connection therewith, also all tools and equipment. The above property located on Tommy Atkins lease, sec. 4-18-7. Fair cash value of property mentioned for each year, total valuation $60,000 per year."

It appears that the Sand Springs Home was founded by Charles Page in 1908, and was incorporated in 1912. Beginning in a small way, its operations were extended, and additional equipment provided until, at the present time, an average of from 90 to 100 orphan children are being cared for. The articles of incorporation of the Home provide for the carrying on of a number of activities, all of which are calculated to provide funds for the operation of the Home.

During the lifetime of Page, he made provision for the financing of the institution, and at his death he willed the bulk of his estate, consisting of property valued at approximately $3,000,000, to the institution.

Since the death of Page, the defendant institution, through its properly constituted officers, has continued the management of these properties. These consist of the gasoline manufacturing plant in controversy herein, a railroad, a cotton factory, an iron foundry, some producing oil wells, and other property. The record shows that a separate set of books is kept for each of the particular industries, but that the Home pays the operating expense and all of the profits go to the Home. The profits, in turn, are used exclusively for the upkeep and maintenance of the Home, and, in addition thereto, about 60 or 70 small cottages, which are maintained for the benefit of widows with small children who are dependent upon charity for support.

It was shown at the hearing before the county court that the average annual operating expense of the Home was from $200,000 to $250,000. On a per capita basis the court found that the institution spent about $2,200 per annum for each child maintained in the institution and therefore defendant was not a charitable institution such as contemplated by section 6, article 10, of the Constitution. The court further found that the property in question was an auxiliary business to the defendant institution and according to the provisions of chapter 3, S. L. 1923-24 [O. S. 1931, secs. 9952-9953], the same was subject to ad valorem taxes.

There is little dispute as to the facts, the principal contentions being as to the law. The plaintiff contends defendant is engaged both in the administration of charities and the conduct of commerical activities; that the operation of the gasoline plant is purely a commercial activity in competition with other business of like kind in Creek county, and the property is taxable as an ordinary business enterprise.

Defendant contends that, under the rule heretofore adopted by this court, the use of the property by a charitable institution determines its taxability; and it being shown that the revenues and profits from the operation of the plant are used exclusively for the maintenance of the Home, which means the care, education, and upkeep of needy widows and orphans, that the property is nontaxable under section 6, article 10, of the Constitution.

The question presented herein is not an open one in this jurisdiction, but is definitely settled in the case of Board of Commissioners of Garfield County v. Phillips University, 144 Okla. 57, 289 P. 720, wherein the rule is stated as follows:

"The purpose for which property and the income therefrom is used is the test to be applied in determining whether such property is exempt from taxation, and that use is a question of fact to be determined from the evidence."

See, also, Board of Commissioners of Tulsa County v. Sisters of the Sorrowful Mother, 141 Okla. 32, 283 P. 984; Beta Theta Pi Corporation v. Board of County Commissioners of Cleveland County, 108 Okla. 78, 234 P. 354; Trinidad v. Sagrada Orden de Predicadores, 263 U. S. 578.

The evidence offered by defendant, that all of the proceeds of the business in question are used exclusively for the use, maintenance, and upkeep of the Home, is not disputed, and the conclusion of the trial court that the Home is not a charitable institution on account of a large per capita cost of operation is contrary to the undisputed facts.

The trial court found that chapter 3, Session Laws 1923-24, is controlling herein, and the property of defendant was taxable by virtue of the provisions thereof. Section 2 of said act provides as follows:

"Any such charitable, educational or benevolent corporation may borrow money and incur debts either for its principal purposes, or for the furtherance of any or all its business enterprises or both, at a rate of interest and bonus, not exceeding six per cent. (6%) per annum on such indebtedness. In case money is borrowed to aid any corporation, a majority of whose stock is lawfully owned by such charitable, educational, or benevolent corporation, it may loan or advance the same to such controlled corporations on such terms as may seem advisable to its trustees. Any such charitable, educational or benevolent corporation so borrowing money to aid any other corporation as aforesaid, may evidence its indebtedness by notes or bonds and secure their payment by mortgaging and pledging all or any part of its property, real, personal and mixed, except the real estate, buildings and personal property consisting of household goods, farm implements, and domestic animals used for the ordinary conduct and operation of the institution of such corporations, which last named property shall never be liable, or in any manner taken for indebtedness, charge or lien of any nature whatsoever contracted by such corporation, to aid another corporation as aforesaid, provided that if any charitable, educational or benevolent corporation shall maintain or carry on any auxiliary business under the terms of section 1 of this act, either directly or through any other corporation or corporations, such fact shall be held to be an agreement on its part and on the part of such other corporation or corporations that all property owned by, devoted to, or used in such auxiliary business hereunder, shall be subject to taxation for all purposes in the same manner as taxable property generally and that such property shall not be exempt from taxation by reason of the fact that the revenues or profits or a portion thereof, are used or intended to be used as additional funds for carrying out the charitable, educational or benevolent purposes of such corporation or for reinvestment by or in behalf of such charitable, educational or benevolent corporation; and it is hereby declared that no such property shall be exempt from taxation; and provided, further, that the real estate, buildings, and personal property, consisting of household goods, farming implements, and domestic animals,

necessary for the ordinary conduct and operation of such charitable, educational or benevolent corporations, shall be exempt from taxation."

It is noted that the bill, by express provision, attempts to subject to taxation all property owned by, devoted to, or used in any auxiliary business operated by a charitable, educational, or benevolent corporation.

The defendant contends that said act is unconstitutional and void as violative of the provisions of section 6, article 10, of the Constitution, which, in part, provides:

"All property used for free public libraries, free museums, public cemeteries, property used exclusively for schools, colleges, and all property used exclusively for religious and charitable purposes * * * shall be exempt from taxation."

The above provision of the Constitution is definite and certain in providing that property used exclusively for charitable purposes shall be exempt from taxation. In so far as said chapter 3, Session Laws 1923-24 [O. S. 1931, secs. 9952-9953], attempts to subject the property so used to ad valorem taxation, the same is in conflict with said constitutional provision, and is therefore invalid and ineffective.

The judgment of the trial court is reversed and remanded, with directions to dismiss the proceeding.

SWINDALL, ANDREWS, McNEILL, and BUSBY, JJ., concur. CULLISON, V. C. J., absent.

WELCH, J. (dissenting). I must respectfully dissent from the majority opinion for the reason that in my view the majority opinion extends and enlarges the tax exemption of the corporation involved to an extent wholly unauthorized by the constitutional provision relied upon.

That the orphans' home and widows' cottages are well equipped and of great value to the 90 to 100 persons who are so fortunate as to be permitted to enter and be therein maintained, is abundantly shown by the record. The maintenance of such institutions is to be commended in the highest terms. However, we are here considering the right of the corporation which owns and maintains the orphans' home and widows' cottages to have a tax exemption on a gasoline manufacturing plant which the corporation also owns and operates in another county, and entirely disconnected from its management of the orphans' home and widows' cottages. No effort is made to tax the buildings and grounds of the orphans' home or widows' cottages, or any personal property used therein or therewith. It is my view that the gasoline plant in Creek county is taxable, as was held by the trial court.

The constitutional provision relied upon is quoted in the majority opinion. It provides, in substance, that "all property * * * used exclusively for school * * * and all property used exclusively for * * * charitable purposes * * * shall be exempt from taxation." By the majority opinion this court holds that other property, a gasoline plant, used in an auxiliary business enterprise for financial gain, is likewise exempt from taxation because the same corporation which owns and operates the gasoline plant also owns and operates an orphans' home and widows' cottages, and because of the manner of handling of the income of the gasoline plant, and the incomes of the several other auxiliary business enterprises in which the same corporation is engaged, including, among others, a railroad, a cotton factory, an iron foundry, and some producing oil wells.

To make clear my view that such tax exemption is not authorized, I must review the facts and the authorities considered by my associates in arriving at their conclusion.

It appears that Charles Page, a resident of Tulsa county, Okla., in about the year 1908, founded an orphan asylum or home for the charitable and benevolent care of orphans and widows at Sand Springs, Okla., with educational facilities. Observing the great good accomplished, and evidently desiring to make provision for the perpetual maintenance of the orphans' home, in 1912, Mr. Page, associating himself with others, formed a corporation named and designated "The Sand Springs Home, a Corporation," which was duly chartered under the laws of Oklahoma. I think it inexact to say that the orphans' home was incorporated, and for that matter the use of the word "home," in the name of the corporation, is not material. The corporation was formed without any capital stock and owning no property except that which it might thereafter acquire. At any rate, the corporation was formed and chartered, and Mr. Page conveyed to the corporation the properties of the orphans' home, that is, the buildings of the home itself and the land occupied thereby. Thereafter, Mr. Page himself largely managed the affairs of the orphans' home and the affairs of the corporation, and dur-

ing his lifetime conveyed to the corporation various other properties of considerable value. And upon his death, the said Charles Page, by his will, gave to this corporation the major portion of his estate, or at least gave the corporation moneys and properties of great value, in fact aggregating the sum of approximately $3,000,000.

I deem it necessary at this time, and also interesting, to note in some detail the provisions of the charter of this corporation. The charter is copied in full in the record, and it clearly discloses that the ultimate purpose of the corporation is to manage the various properties owned, to engage in unlimited activities and enterprises, and to conduct the benevolences and charities of the orphans' home wherein certain orphans and widows are maintained and provided for, and wherein the children are reared and educated. As regards the 'orphans' home, the operations of the corporation may be subject to comparison with other like institutions in America. But as regards the formation of the corporation, its magnificent endowment, and the charter provision for engaging in auxiliary business, this corporation is perhaps unique in the annals of history, and these attributes constitute this corporation at once a magnificent monument to the heart and mind of the man who conceived it. The charter of the corporation is written at considerable length and in minute detail. It authorizes the corporation to engage in almost innumerable auxiliary business enterprises. These, by specific designation, embrace almost every kind and character of construction, manufacturing, and barter and sale, existing in our nation. Particularly authorizing the corporation to engage in the purchase and sale, and construction and sale, of any and all kinds and character of buildings, bridges, or other structures of whatever kind or nature, and to engage in the business of manufacture or sale of practically each and every kind and character of property, apparatus, article or thing of any kind, useful to mankind; to cultivate and raise and grow practically every kind of product of the soil beneficial for the use of man, or for food for man, and to buy, breed, and raise all kinds and character of livestock and prepare the same for market, and to ship and export any and all such products, and in fact all of the products of the auxiliary business enterprises of the corporation. The corporation is specifically authorized to engage in the transportation business, that is, the transportation for hire of persons or property, either by air, land, or water; to transmit messages and communications for hire by

any and all means, specifically including telephones, telegraph and radio. It is not necessary or intended to here set out in full detail all of the many kinds and character of auxiliary business enterprises authorized by the charter of this corporation, but in addition to the things detailed above, it must be noted that the charter authorizes this corporation to own and purchase or construct any and all property of whatever kind or character, and wherever situated, which may, in the judgment of the trustees, be or become necessary or useful in the operation of any one of the auxiliary business enterprises which may be undertaken by the corporation within the provisions of this charter.

The record discloses that the corporation is in fact now engaged in several of the auxiliary business enterprises, including the gasoline manufacturing plant in controversy herein, a railroad, a cotton factory, an iron foundry, some producing oil wells and other property.

The said Charles Page, and those joining him in the formation of the corporation, were residents of Tulsa county, Okla. The principal place of business is in Tulsa county, and in that county is located the orphans' home and other properties used directly in and about and in connection with the actual operation of the orphans' home. The gasoline plant involved in this action is located in Creek county.

The affairs of the corporation are managed by trustees. Through employees they manage all of the affairs of the auxiliary business enterprises of the corporation. The trustees determine the policy of the corporation as to the expansion, that is, they determine the items of real estate or personal property that shall be purchased and the price to be paid therefor. Under the charter they may purchase virtually any kind of property, real or personal, and wherever located. They determine what business enterprises the corporation shall engage in, and where they shall be located, and they manage such enterprises, and, of course, determine the number and personnel of the employees and the wages and salaries to be paid. The salaries of the trustees are fixed at $5,000 per year each, with provisions to raise that amount when it is justified, this evidently to take care of the added duties and responsibilities of the trustees as the corporation grows and expands. The trustees also determine the number and the persons who shall be admitted to and be maintained in the orphans' home. All of the gross receipts of the corporation, that

is, its income, goes into the general treasury of the corporation. Out of the treasury the trustees pay all of the expenditures of the corporation which might be subdivided as follows: (1) Salary of trustees; (2) salary of office force and all other employees; (3) all other aggregate expenses of operation of the various auxiliary business enterprises engaged in by the corporation; (4) the cost of new or additional real and personal property purchased by the corporation; (5) the expense of maintaining the orphans and widows who are beneficiaries of the benevolences of the corporation, and who are 90 to 100 persons on the average.

The exact question for determination on this appeal is this: Does the above stated use of the proceeds from the operation of the gasoline plant operate to exempt from ad valorem taxation the corpus of the property of the gasoline plant, under the quoted provisions of our Constitution?

The majority opinion states:

"The record shows that a separate set of books is kept for each of the particular industries, but that the home pays the operating expenses and all of the profits go to the home."

It is true that a separate set of books is kept for each of the particular industries or auxiliary business enterprises, but it is also true that all of the receipts and all of the income go into the general treasury of the corporation. If the quoted statement in the majority opinion means that the orphans' home receives all this income and pays the operating expenses, then that statement is inexact, for it is the corporation which owns the orphans' home, and which likewise owns the business properties which receive the income and pay the operating expenses. This corporation pays the operating expenses of all of the business enterprises and the operating expenses of the orphans' home. "All of the profits" do not go to the orphans' home, but only a sufficient portion of the profits to maintain the orphans' home.

Continuing and following the above quotation, it is stated in the majority opinion that, "the profits in turn are used exclusively for the upkeep and maintenance of the home, and, in addition thereto, about 60 or 70 small cottages which are maintained for the benefit of widows with small children who are dependent upon charity for support." If this statement means that the profits are used exclusively for the upkeep and maintenance of the **orphans' home** and

widows' cottages, then this statement is inexact for the reason that the profits earned by the corporation are not used exclusively for the upkeep and maintenance of the orphans' home and cottages. These profits, as above stated, go into the general treasury of the corporation, and while they are used in part to maintain the orphans' home and widows' cottages, they are also used in part to maintain the corporation itself and its property, and to purchase and acquire other properties, both real and personal, and to engage in other auxiliary business enterprises. As rapidly as the trustees desire to purchase other properties, and to engage in other business enterprises, then the profits and income theretofore received by the corporation must be expended in acquisition of such additional properties or business enterprises. If one business enterprise should show a loss, then the profits from the other business enterprises must go in part to pay the same; thus, it is clearly apparent, as it seems to me, that it is inexact to say that the profits of these business enterprises, or the profits of any one of them, are used exclusively for the upkeep and maintenance of the orphans' home and widows' cottages where the corporation extends charity to 90 to 100 persons.

The majority opinion appears to rely upon three former decisions of this court, and one decision of the Supreme Court of the United States, being Board of Commissioners of Garfield County v. Phillips University, 144 Okla. 57, 289 P. 720; Board of Commissioners of Tulsa County v. Sisters of the Sorrowful Mother, 141 Okla. 32, 283 P. 984; Beta Theta Pi Corporation v. Board of Commissioners of Cleveland County, 108 Okla. 78, 234 P. 354, and Trinidad, Insular Collector, v. Sagrada Orden De Predicadores, etc., 263 U. S. 578, 68 L. Ed. 458.

I must discuss these cases briefly, for the reason that in my view they do not support the conclusion reached in this case that the gasoline plant is exempt from taxation under the constitutional provisions under consideration.

In the Phillips University Case, supra, there was no engaging in an auxiliary business enterprise. The corporation there owned some surplus real estate not then needed or used directly in or for the work of the University. This real estate was rented, and all of the rent, that is, the gross revenue received, went directly to the University for its maintenance and operation, and did not go into the general treasury of a corporation to be used, at least in

328

part, for engaging in an auxiliary business enterprise, as is true in the Sand Springs Case here under consideration. The Phillips University Corporation was not authorized to engage in any auxiliary business enterprises, and did not do so. In that case this court apparently took the view that since the gross income, that is all of the rents received, without any exception whatever, went directly to the University, there was shown a sufficient "exclusive use" of the real estate itself for college or educational purposes as to exempt such real estate from taxation.

Though it be conceded that the conclusion in the Phillips University Case is thoroughly justified by the constitutional provision in question, yet that conclusion, in my opinion, would not justify the extension of the constitutional exemption as it is so extended in this case.

If it be concluded that the Phillips University Case is itself an extension of the constitutional exemption from the ad valorem tax, still it must be apparent that it could not authorize the still greater extension of the constitutional exemption which is approved and sanctioned by the majority opinion in the instant case.

In both the Sisters of Sorrowful Mother and the Beta Theta Pi Cases, supra, the property under consideration was the buildings occupied by those institutions. In both these cases the corpus of the property was directly used for charitable and educational purposes, and that was not disputed in either case. In both cases it was contended that the property was not exempt from taxation, because the aforesaid uses were not **exclusive,** due to the fact that in each case part of the inmates or occupants paid their way, or, in other words, paid for the accommodation which they received. Neither of those corporations engaged in any auxiliary business enterprises whatever, and substantially the only question there decided was that the additional use of the premises to care for those persons who could pay for the accommodation received would not subject the property to taxation. It is my view that these decisions might be authority for exempting from taxation the buildings of the orphans' home and widows' cottages operated by the corporation in the instant case, even though some of the orphans and widows paid or contributed something for their individual care, but I think those decisions constitute no authority whatever for exempting the gasoline plant of the corporation under the facts in this case.

I think the Trinidad Case, supra, is not in point. In that case the Supreme Court of the United States was considering the question of an exemption from the net income tax, and was not in any manner considering whether property owned by the corporation was or was not subject to an ad valorem tax. There the corporation was a religious corporation, and the insular collector sought to collect a tax on the net income of the corporation. However, that corporation was not liable for the net income tax for the reason that the act of Congress which imposed the net income tax contained a provision specifically exempting from the operations of that act:

"Corporations organized and operated exclusively for religious, charitable, scientific, or educational purposes, no part of the net earnings of which inures to the benefit of any private stockholder or individual." Section 2, par. G (a).

The corporation there under consideration was such a corporation as defined in that provision of the Income Tax Act, and it was true that no part of the net earnings inured to the benefit of any private stockholder or individual, and therefore, by the provisions of the income tax act itself, that corporation was exempted from liability for a tax on its net income. The Supreme Court of the United States merely sustained the right of that corporation to claim an exemption specifically granted to it by Congress. That case as an authority might sustain the right of the Sand Springs Home corporation to be exempted from liability for a net income tax, but it seems to me that such decision does not in any manner sustain the claim of the corporation in the instant case to be exempted from paying an ad valorem tax on its gasoline plant owned and operated by the corporation as heretofore set out.

The majority opinion holds that chapter 3, S. L. 1923-24, sections 9952-9953, O. S. 1931, is in conflict with section 6, art. 10, of the Constitution of Oklahoma, and, therefore, ineffective. In my view, that conclusion of the majority opinion would be correct if the legislative enactment sought to impose a tax on any property "used exclusively for schools or charitable purposes;" however, I seriously question the application of that rule to the property involved here, in view of the facts in this case. It is that legislative enactment, and similar prior acts superseded by that act, which give to such corporations the legal right to engage in auxiliary business enterprises. In effect, that act gives to such corporations the right

to engage in virtually any business activity in which individuals may be engaged in Oklahoma. That act then provides that any property owned by such corporation and used in an auxiliary business enterprise pursuant to the permissive portion of the act shall be subject to ad valorem taxation "for all purposes in the same manner as taxable property generally, and that such property shall not be exempt from taxation by reason of the fact that the revenue or profits, or a portion thereof, are used or intended to be used, as additional funds for carrying out the charitable, educational or benevolent purposes of such corporation, or for reinvestment by or in behalf of such charitable, educational, or benevolent corporation." Thus it is apparent that while this state authorizes such a corporation to engage in any desired auxiliary business enterprise, the state limits such permitted authority of the corporation or burdens such corporation by requiring that the property owned and used in such auxiliary business enterprises shall bear its just proportion of the tax burdens of our citizenship. All corporations are fictitious persons, permitted to exist only by specific authority of law. Their rights to exist and function and operate are necessarily limited or burdened by many provisions of law. It seems to me that this corporation could not at all engage in the very great number of auxiliary business enterprises named in its charter without specific authority of law so to do. This authority is granted by this legislative act; however, the same act provides expressly that property so used shall be taxable. It seems to me that if the corporation accepts the benefits of such legislative authority to engage in an auxiliary business enterprise, it must accept the same with the limitation or burden therein expressly provided. I cannot agree with the contention of the corporation, nor with the conclusion of the majority opinion, that the corporation here involved may own and operate its gasoline plant by permission of the statutory laws of the state, but may at the same time avoid the burden expressly placed thereon by the Legislature that it pay its just portion of taxes upon such property so owned and so used.

The majority opinion disposes of this legislative enactment by concluding that it is in conflict with section 6, art. 10, of the Constitution, and is therefore ineffective. That would be true if the legislative enactment attempted to subject to taxation any of the buildings or grounds of the corporation used exclusively for charitable or educational purposes, and that conclusion would also be true if that section of the Constitution exempted from taxation the property owned by such a corporation, but used in auxiliary business enterprises; but this legislative enactment does not undertake to subject to taxation any property referred to in the constitutional provision, and there is no provision of the Constitution specifically exempting property owned or used as the gasoline plant involved in this action is owned and used. In fact, the constitutional provision under consideration takes no cognizance of the **ownership** of the property therein exempted from taxation. It makes no difference under that provision of the Constitution who may **own** the property. It is the **use** of the property which determines its classification, that is, whether it is taxable or exempt from taxation.

I think the corporation in the instant case is entitled to its tax exemption upon the buildings and grounds of the orphans' home and widows' cottages, but that it has no right whatever to an exemption upon the gasoline plant, or the properties owned and used in the operation of auxiliary business enterprises. This corporation, so splendidly endowed, should easily be able to earn sufficient sums to maintain itself, to pay its just portion of the cost of government by paying taxes on such of its properties as are taxable under my view, to pay its trustees and employees, to abundantly care for its 90 to 100 orphans and widows, and still each year add materially to its capital and wealth. If all such property owned by this corporation, as I deem to be taxable, is held to be exempt from taxation, then in view of the average tax rate in Oklahoma, I apprehend that the sum of money saved annually to the corporation by being relieved of paying its taxes, will itself be sufficient to cover the cost of caring for all of the 90 to 100 orphans and widows cared for by the corporation.

If this corporation is relieved from paying ad valorem taxes on its gasoline plant and other similar properties, then the amount of taxes of which the corporation is relieved will be placed as an added burden on the taxpayers of those counties in which this corporation owns and operates such properties. If by being relieved of such taxes the corporation thereby saves enough money to pay for the maintenance of its orphans' home, then it seems to me, in its final analysis, that those other taxpayers of the state and of the counties affected will be caring for the orphans rather than this corporation caring for them.

If this corporation is relieved of its tax burdens under the rule of the majority opinion, then by its various business activities which are now engaged in, or may be engaged in by its charter provision, it will double the value of its capital and property holdings in 20 years by a net earning each year of about 3½ per cent. of its capital. If it then becomes a corporation of $6,000,000, those figures will exceed the assessed valuation of each of several entire counties in Oklahoma. As this corporation grows in wealth, it will and should acquire other properties under the provisions of its charter and the purpose of its organization. This additional property may be acquired in any county in this state, and may be property of any character or kind approved for purchase by the trustees. When any such property is purchased, then, though it be a manufacturing plant or business property, and wherever situated in Oklahoma, such property would by such purchase be taken off the tax rolls of the county where it was situated. With but fair diligence in management, the corporation should again double its wealth in another 20 years, with the same results following, as I interpret the majority opinion, that wherever this corporation may go, whatever property it may buy, whatever business enterprises it may engage in, its property will be exempt from ad valorem taxation so long as it continues to handle its income through its general treasury, as it now handles it, and so long as it continues to extend charity to such individuals, and to such number of persons as the trustees approve and admit to its orphans' home at Sand Springs in Tulsa county. It is then demonstrated that the best method to test a rule of law is to apply it to an extreme state of facts, and it seems to me that such an application of the rule of law of the majority opinion must lead to the conclusion that the rule of the majority opinion, if I have correctly interpreted that rule, is in no wise justified by the constitutional provision under consideration. It is worthy of note that the corporation involved herein is expressly created to have perpetual existence so that the increase of property owned, if fair diligence is had in management, must go on continuously.

I find no fault whatever with the splendid endowment of this corporation. I heartily approve it. I am sure no fault could be found with the manner in which the orphan children are cared for and educated. All this is done in a splendid manner, and I have no doubt that great good results therefrom, and that this orphans' home is of great value to the state and of inestimable value to the orphan children directly benefited thereby, but, upon the other hand, I have no doubt that the same result could be accomplished if this corporation pays ad valorem taxes on the gasoline plant involved in this action, and on all its properties similarly owned and used in auxiliary business enterprises. I think it should do just that. I think this corporation should bear its just portion of the cost of government in this state, and in any county in which it owns property and uses the same in an auxiliary business enterprise, as it now owns and operates the gasoline plant in Creek county. The maxim that "one must be just before he may be generous" might be applicable to the corporation seeking the tax exemption in this case. I think the gasoline plant is clearly subject to ad valorem taxes under the law.

It is my view that the judgment of the county court of Creek county should be affirmed, and that the corporation here involved should pay to Creek county the ad valorem tax on its gasoline plant, and for these reasons I cannot concur in the majority opinion, and I respectfully dissent therefrom.

I am authorized to say that Chief Justice RILEY and Mr. Justice BAYLESS concur in this dissenting opinion.