OKLAHOMA COUNTY v. QUEEN CITY
LODGE No. 197, I. O. O. F.

No. 31076.   Feb. 13, 1945.

*156 P. 2d 340.*

132

Lewis R. Morris, County Atty., and B. C. Logsdon, Asst. County Atty., both of Oklahoma City, and George Miskovsky, County Atty., Norman J. Futor, Asst. County Atty., both of Oklahoma City, for appellants, Tax Officials of Oklahoma County.

Rainey, Flynn, Green & Anderson, of Oklahoma City, for appellee.

Everest, McKenzie & Gibbens, Attorneys for Phillips University, V. P. Crowe and F. C. Love, Attorneys for Oklahoma City University, Billups & Billups, Attorneys for Oklahoma Baptist University and Baptist General Convention of the State of Oklahoma, all of Oklahoma City, Martin, Logan, Williams & Boesche and Richard P. Ryan, Attorneys for University of Tulsa, all of Tulsa, John F. Eberle, of Oklahoma City, Attorney for Most Reverend Francis C. Kelley, Bishop of the Diocese of Oklahoma City and Tulsa, for and on behalf of the Educational, Charitable and Religious Institutions of the Catholic Church in Oklahoma, amici curiae.

The Grand Lodge of Oklahoma, of the Independent Order of Odd Fellows, R. O. Wilson and Chas. B. Duffy, its attorneys, both of Ponca City, amicus curiae.

John E. Luttrell, of Norman, Attorney for McFarlin Memorial Methodist Church of Norman, amicus curiae.

Charles P. Gotwals, Wm. A. Killey, and James D. Gibson, all of Muskogee, amici curiae.

WELCH, J. Queen City Lodge No. 197, I. O. O. F., hereinafter referred to as the Lodge, commenced this proceedings by filing with the board of county commissioners its verified complaint, seeking to strike from the tax rolls certain real estate on the contention that same was exempt from ad valorem taxation by the State Constitution. Showing was therein made to excuse failure to theretofore appear before the equalization board.

To this complaint appellants, the county assessor, the county treasurer, and the county board of equalization, herein called the Tax Officers, by the county attorney, filed a special demurrer which was sustained by the board of county commissioners, and the Lodge appealed to the district court. At the commencement of the trial in the district court it was agreed that all of the evidence should be introduced, that at the close of the evidence the court should rule on the special demurrer to the complaint, and that if the demurrer was overruled, the court should then pass on the merits.

At the conclusion of the evidence the court overruled the special demurrer and rendered judgment for the Lodge on the merits, and this appeal followed.

At the outset we are faced with two procedural questions, which we must first determine.

The Lodge has filed a motion to dismiss the appeal for the reason that the said tax officers are not aggrieved by said judgment and are without authority to appeal, and consequently this court is without jurisdiction to entertain the appeal. They cite 19 O.S. 1941 § 3, providing that the powers of the county "shall be exercised by its board of county commissioners," and Sequoyah County v. Helms, 40 Okla. 565, 139 P. 958; Board of Com'rs v. Taylor, 90 Okla. 15, 215 P. 606, and Rice v. Swartz, 90 Okla. 16, 215 P. 605, holding that the county attorney may not prosecute an appeal for the county where the board of county commissioners have by their affirmative official acts denied him such right. They also cite In re Assessment of Muskogee Gas & Electric Co., 83 Okla. 167, 201 P. 358, and Conner v. Drummond, 173 Okla. 251, 46 P. 2d 447, and other cases, holding that a tax ferret is without authority to appeal in a tax ferret proceeding on the theory that he is not an aggrieved party within the meaning of the statute authorizing appeals. The Lodge does not contend that the county is not aggrieved by the decision appealed from or that it could not appeal from said decision.

Under the provisions of 19 O.S. 1941 § 183, it is the duty of the county attorney to "prosecute or defend in all courts, state and federal, in any county in this state, all civil actions or proceedings in which his county is interested or a party." It was to the interest of his county to prosecute an appeal from said judgment. It costs money to do so. In the absence of a showing to the contrary, the presumption of law is that the county commissioners, from whose adverse order the Lodge appealed to the district court, have sanctioned the appeal and are financing it, and that the county attorney in prosecuting the appeal has acted within his rights. 10 R.C.L. 880; 20 Am. Jur. 174-182; 22 C.J. 130-143; 31 C.J.S. 798-826. In Leedy v. Brown, 27 Okla. 489, 113 P. 177, it was held that where the Attorney General prosecutes a proceeding for the state he is presumed to do so after having been requested by the Governor or a branch of the Legislature where such request is necessary. The statutes do not require that the record affirmatively show such consent. Here, the county is the real party in interest, and it is not necessary that it be named in the petition in error as a plaintiff in er-

ror where the appeal is in fact prosecuted by the county attorney for the county. The defect is one of form rather than one of substance. See Dolezal v. Bostick, 41 Okla. 743; 139 P. 964; Bailey v. Lankford, 54 Okla. 692, 154 P. 672; State v. Pure Oil Co., 169 Okla. 507, 37 P. 2d 608.

Appellants first contend that the original complaint did not state facts sufficient to confer jurisdiction upon the board of county commissioners. Determination of this question requires consideration of 68 O.S. 1941 § 184(d), the applicable portion of which is as follows:

"The Board of County Commissioners of each county is hereby authorized to hear and determine allegations of erroneous assessments, mistakes or errors made in assessing . . . land or other property, before the taxes have been paid, on application of any person or persons who shall show by affidavit good cause for not having attended the meeting of the county board of equalization for the purpose of correcting such error, mistake or difference, and if upon such hearing it appears . . . that property exempt from taxation has been assessed, it shall be the duty of the board of county commissioners to refer its findings to the county board of equalization to correct such error, if such exists. . . . "

The county attorney contends that the complaint failed to state "good cause" for the nonappearance of the Lodge before the county board of equalization under such statute. He asserts that the Lodge was bound in law to know that the assessor was required to place all conditionally exempt property on the assessment roll, and that he was without power to determine a claim of conditional exemption. He argues that the Lodge was, therefore, charged with knowledge that the building, which had been on the tax rolls for 1940, would be on the assessment roll for 1941 to be transmitted to the county board of equalization, and he asserts that the allegations of the complaint that the proceeds of the building were devoted to charitable purposes and that the property was exempt were but legal conclusions, and were not factual statements of "good cause" for failure to attend the meeting of the county board of equalization.

We are of the opinion, and hold, that the complaint was sufficient under the provisions of section 184(d) above. The argument of the county attorney limits too narrowly the meaning of the words "good cause." Viewing our taxing statutes as a whole, it is apparent that the Legislature has intended to provide every property owner an opportunity to be heard on his claim of exemption. The forum ordinarily provided, and which should ordinarily be resorted to, is the county board of equalization, but the Legislature realized that circumstances would sometimes arise which in fairness should excuse a property owner for not having attended the meeting of such board, and provided that in such cases application for relief might be made to the board of county commissioners. It must be borne in mind that one of the circumstances alleged was the lack of official notice required to be given by chapter 115, S.L. 1933, which was in effect at the time of the assessment, and the terms of which applied to property arbitrarily assessed in the absence of a return by the owner. In re Moore, 182 Okla. 330, 77 P. 2d 676.

In view of our decision we need not pass upon the contention of the Lodge that the complaint also conferred jurisdiction on the board of county commissioners under 68 O.S. 1941 § 15.56.

On the merits of the case the controlling question is whether a certain building is taxable or exempt from taxation. It is a twelve-story building known as the Perrine Building, occupying five city lots located at the intersection of First and Robinson streets in the business district of Oklahoma City, and was originally constructed some years ago for use as an office building. Recently the building was purchased by the Lodge, which now occupies all of the twelfth floor, and the other eleven floors are rented for office, stores, and

shops, with elevator service and other maintenance usually found in modern buildings of this character.

The appellant, hereafter referred to as the County, contends that the lots and buildings are taxable without any tax exempt feature, while the Lodge contends the building and lots are wholly exempt from taxation.

In the trial court the claim of the Lodge that it is a charitable and benevolent association was sustained, and we accept that conclusion. It follows then by the constitutional provision that the Lodge is entitled to tax exemption as to all property it owns and maintains in the authorized exempt use. It does so use the twelfth story of this building.

The Lodge claims that it so uses the first eleven floors of the building by reason of the fact that the rent money received goes to further its general purpose, and that it is a benevolent and charitable association from which no member takes any profit.

The Lodge points to several of our prior opinions in support of its claim that the building is wholly exempt. It is true that in several former decisions we have held that the use of the income of property may be taken and considered as the identical use of the property itself, so that the use of the income from property in charity would constitute the use of the property itself exclusively in charity and therefore operate to exempt the physical property itself from taxation for being used exclusively in charity.

We have, however, felt impelled, in view of the status of our former opinions and the effect upon the constitutional law of this state, to re-examine the provisions of our Constitution with respect to exemption of property from taxation and reconsider such of our opinions as relate thereto. Some of our former opinions must be overruled.

We are mindful of the several considerations embraced within the rule of stare decisis, to the effect that courts are slow to interfere with principles announced in the former decisions and often uphold them even though they would decide otherwise were the question a new one (Webb v. Semans, 110 Okla. 72, 235 P. 1074), and we are mindful of the importance given to the stability of the law, and of the effect of the action of the court upon property and titles. Lasiter v. Ferguson, 79 Okla. 200, 192 P. 197.

However, the rule as always stated discloses that courts are not arbitrarily required to follow their former decisions.

A very good statement of the rule is found in 21 C.J.S. page 392, a part of section 215, as follows:

"It is generally held that a court will not as a rule inquire into the construction of a constitutional provision or the constitutionality of a statute or ordinance where this question has been passed on in previous decisions by a court of last resort, even though a different result might be desirable, *unless such previous decisions are manifestly erroneous, and there are cogent reasons for overruling them;* and this is especially true where such decisions have been long relied on as authoritative, or where such decisions have become rules of property, as shown infra sec. 216. (Emphasis ours.)

"However, it has been stated in some early cases that the doctrine of stare decisis cannot control questions involving the construction and interpretation of the organic law at least where no rule of property is involved, or at least that the doctrine does not apply with the same force to decisions on constitutional questions as to other decisions, and while previous decisions will not be entirely disregarded and may, in case of doubt, control the views of the court, they will be considered merely as authorities tending to aid in arriving at a proper conclusion, and not as a rule to be followed without inquiry."

Excellent statements in the premises are found in 14 Amer. Jur. page 341-43, sections 124 and 125, as follows:

"Notwithstanding the rule of stare decisis, or inclination to follow prece-

dents, the courts have the power, and frequently exercise it, of departing from rules which have been previously established. The strong respect for precedent which is ingrained in our legal system is a reasonable respect which balks at the perpetuation of error, and it is the manifest policy of our courts to hold the doctrine of stare decisis subordinate to legal reason and justice and to depart therefrom when such departure is necessary to avoid the perpetuation of pernicious error. Accordingly, the authority of precedents must often yield to the force of reason and to the paramount demands of justice as well as the decencies of civilized society, and the law ought to speak with a voice responsive to these demands. On the other hand, decisions ought not to be lightly overruled, even though they may seem archaic, for judicial vacillation, except for very cogent reasons, is to be avoided. The case must be very strong, and one where mistake and error have evidently been committed, to justify the court in reversing its own decision. . . ."

And at page 345, section 128, as follows:

"In the matter of constitutional provisions, it has been held that while courts recognize to the fullest extent the necessity for stability, consistency, and firm adherence to the doctrine of stare decisis in passing upon and construing any provision of the organic law, yet if an error has been committed and becomes plain and palpable, they will not decline to correct it, even though it may have been reasserted and acquiesced in for many years, especially where the effect of such an error cannot be cured by the Legislature. . . . ."

See, also, the statement attributed to Chamberlain, Stare Decisis, in the able discussion to be found in 37 Harvard Law Review, page 409.

In the light of our duty thus fully shown, we now examine our former decisions to discover whether they are palpably wrong; and, if so, whether they effect substantial evil and injustice; the feasibility of remedies other than action by us; and the respective good or evil to be effected by allowing them to stand or to now correct our errors if error has occurred therein.

We think that the first of our opinions which may be said to fully support the Lodge's theory of total exemption of its property is Board of Commissioners of Garfield County v. Phillips University, 144 Okla. 57, 289 P. 720. We held in the syllabus thereof as follows:

"The purpose for which property *and the income therefrom* is used is the test to be applied in determining whether such property is exempt from taxation, and that use is a question of fact to be determined from the evidence." (Emphasis ours.)

It is to be noted that therein it is held that all property is exempt by Constitution ". . . so long as the property itself *or the income therefrom* was devoted solely to the appropriate objects of these institutions."

Our former opinion of Board of Com'rs of Tulsa County v. Sisters of the Sorrowful Mother, 141 Okla. 32, 283 P. 984, is therein cited as supporting the following rule:

"The purpose for which property is used is the test to be applied in determining whether such property is exempt from taxation, and that use is a question of fact to be determined from the evidence."

Of the last-quoted rule we find no fault. We think, however, the Sisters of the Sorrowful Mother Case, supra, is not authority for the rule that it is sufficient to bring property within constitutional tax exemption if the income therefrom is devoted to educational use. No other authority for the rule of the Phillips University Case is cited.

In Sand Springs Home v. State, 168 Okla. 323, 32 P. 2d 928, we re-announced the rule exactly as stated in the syllabus of the Phillips University Case. In this Sand Springs Case we considered the matter settled by the cited former decision, and thus we again held that the purpose for which property is used or for which the income from property is used is the test to be applied in determining whether the property itself is exempt from taxation.

In Board of Commissioners of Tulsa County v. Sand Springs Home, 185 Okla. 305, 92 P. 2d 376, we perhaps went a step further, as we there held and wrote the syllabus rule that where income-producing property is conveyed to a charitable corporation and the net income from such property is devoted to charity, the physical property itself is exempt from ad valorem taxation. There we cited the former Sand Springs Home Case and the Phillips University Case among others.

It is thus to be seen that those former opinions which would seem to establish the rule in accord with the Lodge's position herein contain no citation of authority supporting same, save in the later cases the court cited the authority of our former opinions. It is obvious that the "use" question under the provisions of our Constitution did not in those cases receive the careful investigation which we now think it should have at our hands.

In respect to that question our Constitution provides (a part of section 6, art. 10), as follows:

"All property used for free public libraries, free museums, public cemeteries, property used exclusively for school, colleges, and all property used exclusively for religious and charitable purposes, . . . Provided, that all property not herein specified now exempt from taxation under the laws of the Territory of Oklahoma, shall be exempt from taxation until otherwise provided by law. . . ."

Section 50, art. 5, provides:

"The Legislature shall pass no law exempting any property within this State from taxation, except as otherwise provided in this Constitution."

The laws of the Territory of Oklahoma made applicable until otherwise provided by law, by the above proviso of section 6, art. 10, of the Constitution, insofar as pertinent here, appear as a part of section 5914, Wilson's Statutes of Oklahoma 1903, as follows:

"The following classes of property shall be exempt from taxation, and may be omitted from the list herein required to be given: . . .

"Fifth: The grounds and buildings of library, scientific, educational, benevolent and religious institutions, colleges or societies, devoted solely to the appropriate objects of these institutions, not exceeding ten acres in extent, and not leased or otherwise used with a view to pecuniary profit. Section 5914."

Thus we see, insofar as concerns our present question, that our Constitution provided that "all property . . . used exclusively for religious and charitable purposes, . . ." and by virtue of the constitutional proviso and Wilson's Statute, supra, "the grounds and buildings of . . . benevolent and religious institutions, colleges or societies, devoted solely to the appropriate objects of these institutions, . . . and not leased or otherwise used with a view to pecuniary profit, shall be exempt from taxation."

We have consistently said, and reassert here, that in cases such as this the use to which property is devoted is the constitutional test to be applied in determining whether same is exempt. Whether or not ownership must be coupled therewith in some instances is not now before us.

Constitutional and statutory provisions similar to section 6, art. 10, of our Constitution had long been in existence in many of the states at the time of the adoption of our own in 1907, and we must assume that the framers of our Constitution and the people in the adoption of same were generally familiar with such provisions, and with the construction generally accorded them, and to have anticipated due consideration thereof to be given by this court.

What was the rule in 1907, when our Constitution was adopted, in the other states, as to the exemption from taxation of property rented out, under constitutional and statutory provisions similar to that portion of section 6, making exclusive use the test for exemption, and as to whether tax exemption provisions should be strictly construed? The two texts dealing with taxation

probably in most general use at that time were 12 Am. & Eng. Encyclopedia of Law (2d Ed.) published in 1899, and Cooley on Taxation (3rd Ed.) published in 1903.

In Cooley on Taxation (3rd Ed.) at page 350, it is said that "if the exemption is only of property used for school purposes, it will not apply to property held merely for revenue" (citing cases from six states and none to the contrary); and at page 353 it is said that "if the property which is exempt for a particular use is leased, or otherwise appropriated to any other use, the exemption is lost" (citing cases from 20 different states, including our neighboring states of Arkansas, Kansas, Missouri, Nebraska, and Texas). The same work, at page 357, says:

"It is also a very just rule, when an exemption is found to exist, it shall not be enlarged by construction. On the contrary, it ought to receive a strict construction; for the reasonable presumption is that the state has granted in express terms all it intended to grant at all, and that unless the privilege is limited to the very terms of the statute the favor would be extended beyond what was meant," (citing cases from 24 states and the United States Supreme Court, and none to the contrary).

In 12 Am. & Eng. Enc. of Law (2d Ed.) at page 318, it is said that "when the Legislature exempts from taxation property used for a specified purpose, the exemption includes such property only as is directly and immediately used therefor, and cannot be extended to other property, even though the income derived therefrom is entirely devoted to furthering such purposes" (citing cases from Canada and 17 states, including our neighboring states of Arkansas, Kansas, Nebraska, and Texas. No cases holding to the contrary are cited, although cases from several states, applying charter provisions not depending upon use, are cited; and at page 323 it is said that only actual present use, and not a mere intention to use it in the future, for specified purposes, will exempt property under such a law (citing cases

from ten states in support of this rule and from two to the contrary); and at page 305 the reason for the rule of strict construction is stated as follows:

"The reason for the rule above set out is very apparent, for beyond the fact that exemptions are the exceptions to the rule of taxation, and are in the nature of a renunciation of sovereignty, the relieving from the burden of taxation of the class of persons or property, however meritorious and deserving of assistance that class may be, throws a correspondingly heavier burden upon all other classes, thus creating an inequality which is repugnant to common right and to the established principles of republican government. Hence the courts have uniformly refused to favor exemptions."

However, at page 306 it is said that it has been suggested that the rule of strict construction should not be applied to exemptions of religious, charitable and educational institutions on the theory that they relieve the government of burdens which it would otherwise have to bear (citing cases from five jurisdictions).

In several of our former decisions we have announced the correct rule in the syllabus to the effect that it is the use of the property itself which is the test to be applied in determining taxable status or exemption, to wit, Tulsa County v. Sisters of Sorrowful Mother, 141 Okla. 32, 283 P. 984; Beta Theta Pi v. Board of Com'rs, 108 Okla. 78, 234 P. 354; Phi Kappa Psi v. State, 175 Okla. 605, 53 P. 2d 1130, and Southwestern Osteopathic Sanitarium v. Davis, 115 Okla. 296, 242 P. 1033.

We are now convinced that we were in serious error when we departed from that rule or enlarged upon it to the extent of holding that the mere use of income from property could alone be applied as the test of the use of the property itself in determining tax exemption under the constitutional provision here considered. That was the rule adopted in the syllabus in the Phillips University Case, 144 Okla. 57, 289 P. 720; in the first Sand Springs Home

Case, 168 Okla. 323, 32 P. 2d 928, and in the second Sand Springs Home Case, 185 Okla. 305, 92 P. 2d 376.

Our attention is not directed to any other decisions in which we have announced the same or a similar rule in the syllabus.

Upon more mature consideration we are convinced that such rule is unsound and the error in such a rule could hardly be more clearly presented and demonstrated than in the present case. The application of that rule here, and following to its logical conclusion, would mean that this or any other charitable or benevolent corporation or organization could freely purchase rent income properties or other properties, either for cash or on credit, and use the same purely to obtain revenue and take them off the tax rolls wherever they were situated in the state; the properties themselves thus being used not in charity, but in business competition and purely for financial income, and thus the organization or corporation would inevitably become richer and richer by its tax saving alone, and therefore virtually at the expense of the taxpayers. We will no longer approve such rule, and later in this opinion will refer specifically to certain other of our former decisions which are cited by the parties here.

This brings us to a consideration of the question whether we can fully follow the contentions of either party in this action. We cannot follow the contentions of the Lodge in full for the reasons stated. If we follow the contentions of the County in full, we will tax these properties in full and thereby deprive the Lodge of any benefit of the constitutional right to exemption of its property insofar as it uses any of its property exclusively in charity and benevolence. That result should be avoided because the constitutional right has existed since statehood. It is plainly stated in the Constitution. It is based on motives of humanity and mercy and evidences a desire to foster and further charities and benevolences by the tax exemption therein provided. It has been held that tax exemption provisions in reference to such matters should be liberally construed by reason of the nature of the work done by recipients of this character of exemption. See Commonwealth v. Lynchburg Y.M.C.A., 115 Va. 745, 80 S.E. 589; State v. Fisk University (Tenn.) 10 S.W. 284; Salt Lake Lodge v. Grossback, 40 Utah, 1, 122 P. 192, and Colorado Seminary v. Board of Com'rs, 30 Colo. 507, 71 P. 410.

Thus we arrive at the question whether it is possible in a case like the one at bar to allow to the Lodge a just benefit of its constitutional right to tax exemption without going to the extreme limit of exempting all the property here involved and arriving at an unjust result. It would seem in justice and reason that, since the Lodge is definitely entitled to a just benefit of this constitutional provision, it is the duty of the court to determine and declare the way in which it may receive same. And it is plain that if we were considering only a one-story building owned and used by the Lodge as the twelfth floor is used, the whole would be exempt, and likewise that if we were considering only a building used in general rental as the first eleven floors of this building are used, and separate and apart from the Lodge itself, then the whole would surely be taxable. We observe a statement in the record in very general terms that the Lodge received an "income on the 12th floor," but that was not explained nor inquired about further. The record is silent as to the source of that income or the consideration therefor. We deem that wholly insufficient to raise any special point or to merit discussion or to disturb our conclusion of exclusive Lodge use of the 12th floor.

We have not before had occasion to pass on the constitutional rights and liabilities of such an organization where it owned a building and had separate occupation and separate uses of different parts of the building as is here apparent.

The County urges that when the Lodge purchased this building it agreed

to an arrangement whereby the management and renting of the first eleven floors is handled in effect by a representative of the mortgage creditors, so it is argued that in truth and in fact the Lodge has not assumed the actual possession or management or control of the first eleven floors of the building.

Thus the fact is emphasized that the Lodge maintains a definite portion of this building in one fixed use while maintaining the other portion thereof just as definitely in a separate and different fixed use. These two uses are wholly different when considering the use of property which will exempt the same from ad valorem taxation under the Constitution.

Our attention is drawn to the view that such fixed separate uses of this property should direct us to a conclusion which would accord to the Lodge a tax exemption equivalent to that portion of its property which is used exclusively in charity and benevolence, while applying the ad valorem tax to its property in proportion or insofar as the Lodge's property is separately used exclusively in a nontax-exempt use.

The authorities disclose a number of exceptions to the rules which affect the complete loss of the exemption when the property is not entirely used exclusively for admittedly exempt purposes. They are to be observed in the "principal use" rule and the "incidental or occasional use for other purposes rule, etc."

There is still another rule, rather well established when we adopted our Constitution and of more accepted application now, to the effect that where property incapable of separate assessment is used in part for exempt purposes and in part for nonexempt purposes, the same may and should be taxed in proportion to the respective uses and to the total value. Such rule has been applied as more nearly carrying out a clearly expressed intent and desire to exempt property actually and exclusively used for the named exempt purposes and to avoid the necessity of declaring the complete loss of the exemption. That rule is thought to more nearly conform to the true intent and purposes of such exemption provisions as we have here.

The rule is well expressed in vol. 2, Cooley on Taxation (4th Ed.) page 1442, sec. 688, as follows:

"If the exemption is limited by its terms to property used for certain purposes, the question sometimes arises as to whether the exemption is entirely or only partially lost where a single piece of property is partly devoted to exempt purposes and partly devoted to nonexempt purposes, especially where the exemption is limited to property 'exclusively' or 'wholly' or 'solely' used for certain purposes. Of course if the part not used for exempt purposes is wholly separate and apart from the other property used for exempt purposes, then there is no question but that the nonexempt part should be taxed and the exempt part not taxed. Often, however, it is difficult to separate the exempt part from the nonexempt part, as where part of a building is used for exempt purposes and a part for nonexempt purposes. In such a case, if the statute be strictly construed, it would seem that if part is used for a nonexempt purpose then the building, considered as an entirety, is not 'exclusively' used for exempt purposes; and this has either been assumed without discussion or directly held in some cases refusing any exemption at all. On the other hand, the better rule seems to be that if the *exempt and nonexempt parts are separable, for purposes of valuation,* the former should be held not taxable and the latter taxable. Sometimes the question is expressly regulated by statute." (Emphasis ours.)

And in volume 3 of the same text, page 2315, sec. 1147, a part of which we quote as follows:

"If part of the property is exempt it should not be valued as an entirety, but where the exempt and nonexempt portions are not physically separable it is proper to value the property as a whole and then deduct the value of the exempt portion. . . ."

The rule is stated as a part of section 517, at page 461 of 61 C.J., in the following language:

"Where property is in part used for profit, exemption has been denied with respect to such part or proportion and granted as to the part or proportion used for charitable purposes."

The rule is again stated in 26 R.C.L. page 327, as a part of section 285, as follows:

". . . When the ground floor of a building owned and occupied by a charitable or educational institution is rented for stores, or in some other manner part of the building is leased to private parties, the part so used is taxable. . . ."

The case of Parker v. Quinn, Co. Treas., 23 Utah, 332, 64 P. 961, decided in 1901, is illustrative of the rule and cites many authorities in support thereof. We think the exemption provisions in the law there under construction are similar in respect to this question as regards the provisions of our Constitution. There a charitable organization sought exemption of its two-story building, the upper floor of which was used continuously for its charitable purposes. The lower floor being rented and held for rent for store rooms, all of such rents being applied by the organization for charitable purposes. We quote therefrom as follows:

". . . Among the several classes of property exempt are 'lots with buildings thereon used exclusively for either religious worship or charitable purposes.' In the case at bar the relief society which owns and manages, the property over which this controversy arose was organized and acts exclusively for charitable purposes. It ministers to the poor, sick, and destitute of the community. Its purposes are excellent, and the means adopted commendable; and, no doubt, the state is measurably benefited by having its poor and helpless subjects under the benign protection and care of such a society. If, therefore, in the fundamental law, in addition to specifying lots and buildings thereon used exclusively for charitable purposes, rentals derived from such buildings and used for such purposes were also enumerated, we would have no difficulty in this case in declaring the whole property, including the portion rented and held for rent, exempted from taxation; but the lawmakers did not see fit to exempt such rentals in express terms, and we can furnish no aid by construction. Only such of the society's property, therefore, as is occupied and used exclusively for charitable purposes, is exempt from taxation. It follows that the exemption does not extend to that portion not appropriated by the society to its own use, but held as a source of revenue. Especially is this so since the value of each portion is ascertainable, as appears from the findings of the court. Where, therefore, as in this case, a portion of certain property owned by a charitable institution is occupied and used by it for charitable purposes, and the other portion thereof is devoted to purposes of revenue, the portion used and occupied for charitable purposes is exempt, and the portion not so used and occupied is subject to taxation.

"We are aware that a few cases hold that under such circumstances the exemption is lost as to the whole property, and that some, on the contrary, hold that the whole property is exempt. We think, however, that the weight of authority is in harmony with the rule above stated, and that the disposition of this case in accordance therewith is equitable and just. In City of Philadelphia v. Barber, 160 Pa. 123, 28 Atl. 644, it was held:

" 'Where a part of a building is used for church purposes, and certain rooms in the building are rented for a school, the building may be divided for the purposes of taxation, and the portion used solely for church purposes be declared exempt from taxation.'

"County Com'rs of Frederick Co. v. Sisters of Charity of St. Joseph, 48 Md. 34, is a case where the proof showed that, among other improvements which were claimed by the appellees, a society organized for charitable purposes, to be exempt, there were one or more buildings in which a number of schools were required to pay tuition at the rate of $250 per annum; and the court held that so much of the property as was appropriated to this secular and educational

142

purpose 'for revenue' was taxable, notwithstanding the fact that the 'surplus revenue' thus derived was devoted to charitable uses. . . .

"So, in Proprietors of South Congregational Meeting House in Lowell v. City of Lowell, 1 Metc. (Mass.) 538, the plaintiffs were specially incorporated for the purpose of purchasing a site for a meeting house, and erecting one. This they did, and erected a building, the upper story of which was divided into pews and furnished for religious purposes, while the lower story was fitted up for stores. Exemption from taxation having been claimed, Mr. Chief Justice Shaw, speaking for the court, said: 'Such being the nature of the property the court are of the opinion that the exemption in the statute extended to that part of the property only which was used as a place of worship, and for purposes connected with it, such as the vestry, the furnace, and the like, but did not extend to separate tenements used for purposes exclusively secular. The income raised from these tenements goes as directly to the use of the proprietors, by paying their debts, as if they made annual dividends. There may be several distinct tenements under the same roof, and tenements are as essentially distinct when one is under the other is when one is by the side of the other.'

"In Association v. Pelton, 36 Ohio St. 253, it was said: 'The fact that the building is so constructed that the parts leased or otherwise used with a view to profit cannot be separated from the residue by definite lines is no obstacle to a valuation of such parts for purposes of taxation, having due reference to the taxable value of the entire property,'" (Here the opinion cites many authorities.)

And it is further said:

"We are of the opinion that the court erred in holding that all of the property in question was subject to taxation. That part of the building occupied and used exclusively by the society for charitable purposes is exempt, while the other part not so used may be taxed.. . ."

In City of Philadelphia v. Barber, 160 Pa. 123, 28 Atl. 644, decided in 1894, a church sought exemption of its building under a statute limiting the exemption to property "in actual use and occupation for the purposes aforesaid." While our Constitution does not contain the terms "and occupation," we think the opinion is of importance here in support of the theory of prorata taxation. The court there said:

". . . The exemption of church property under the act of 1874 being limited, therefore, to that in actual use and occupation, and the necessary construction being that such use and occupation must be exclusive as well as actual, and not the source of income or revenue, the exemption in the present case must be limited to such parts of the building as meet those requirements. If the church lot was large, and the church should erect a row of stores around its edge, and rent them out, there could be no question that that part of its property would be taxable, though the income should all be applied to the support of the church. It would not come within the intent and description of the statute. What was done in the present case amounts to the same thing. Part of the building is used solely by the church, and part is rented out for school purposes. The rooms being all under the same roof makes no difference in principle. The parts rented and producing income are liable to taxation. There is, in fact, no express warrant in the act for dividing the building for purposes of taxation, and exempting any part of it when other parts produce income; but such division was sustained by Judge Allison in Association v. Donohugh, 7 Wkly. Notes Cas. 208, upon grounds of equity and the broad intent of the statute, and has been received with general acquiescence."

In Board of Home Missions and Church Extension of Methodist Episcopal Church v. City of Philadelphia, 266 Pa. 405, 109 Atl. 664, the court, in considering a case where the trial court had prorated the total valuation for purposes of taxation, stated:

"While the method pursued by the court below of dividing the building here in question according to the relative rental values of the floor space allotted to others and occupied by plain-

tiff may not always be fitting—as a general rule — yet we are not convinced it is inappropriate to the present case. . . ."

"The rule adopted by the court below in the present case was equitable; it did defendants no injustice, and the results thereby attained will not be disturbed."

We have heretofore applied in Oklahoma the rule and principle under discussion in the matter of taxation of personal property used in part for the production of oil and gas and in part used for other purposes not excluded from ad valorem taxation by reason of our gross production statutes, in Shaffer Oil & Refining Co. v. Treas. of Creek County, 175 Okla. 6, 52 P. 2d 76; Magnolia Pet. Co. v. State, 175 Okla. 11, 52 P. 2d 81, and Magnolia Pet. Co. v. Carter County, 175 Okla. 572, 54 P. 2d 155. An instance of prorata valuation and assessment to give effect to partial exemption is noted in connection with application of our homestead exemption statute, 68 O.S. 1941, §§ 33 to 47, inclusive; and see section 15.52.

One of the more recent cases involving the construction of an exemption statute similar to ours in respect to our present question is Young Men's Christian Ass'n of Lincoln v. Lancaster Co., 106 Neb. 105, 182 N.W. 593, decided in 1921. The opinion there discusses the question of taxing upon a prorata basis, as well as other questions here. See 34 A.L.R. 1060. We quote therefrom as follows:

"The Constitution and statutes of this state permit exemption from taxation only in case the building was, during the year for which it was assessed, 'used exclusively . . . for schools, religious, . . . and charitable purposes.' Rev. Stat. 1913, sec. 6301. The contention of the appellee is that it is a religious and charitable institution, and that the building in question, being used for the promotion of its general purposes, is, in a legal sense, used for religious and charitable purposes, although parts of the building are used for purposes **which, if disassociated** from and considered apart from their utility in carry-

ing out the general plan, are not strictly either charitable or religious; such uses being merely incidental and not destructive of the exempt character of the property."

This is followed by a discussion of whether the association is such as to come within the exemption, after which the court proceeds:

"It follows from the foregoing discussion and review of the judicial opinions bearing upon that question that the appellee is to be regarded as a charitable organization, both in its professed purposes and by virtue of its actual performances in the practical work that it does for the general benefit of society in the elevation and betterment of young men and boys. The use to which it puts its building in carrying out its work must, therefore, be characterized, in its general aspects, as charitable, and the building in question is used for charitable purposes, except insofar as some part thereof may be used for purposes foreign to or inconsistent with its dominant purpose.

"This brings us to the argument of the appellant that the cafeteria, tailor shop, and barber shop maintained in the building are merely business ventures carried on for profit, for the accommodation of members and others who avail themselves thereof, and are too remotely connected with the general purposes of the association to be treated as uses for charitable purposes of the building, or of the parts thereof occupied by them.

"The cafeteria is operated under an agreement by which the necessary floor space is leased to outside parties, who pay 10 per cent of the gross receipts as rental. The lessees supply the fixtures, with the option reserved to the appellee to purchase them at any time, and thereupon the lease shall terminate. The revenue to the appellee from the cafeteria averages about $700 a month. The tailor shop rents for $15 a month; the barber is engaged by the month; and the appellee derives about $25 a month net revenue from the barber shop. The cafeteria serves the members and those of the general public who choose to come.

"The appellee's argument with reference to these facilities is that they are

necessary to the complete carrying out of its plan to make it attractive to young men and to the public generally to come to the building, and thereby to strengthen and extend the influence of the association. Not only for the members, but for their near relatives and friends, it is a valuable auxiliary to the work to get groups of men together at mealtime, which is the best, and in some cases the only practicable, opportunity to arouse their interest in the work of the association, and the revenue from the eating establishment is a great help in keeping up the general expenses. The tailor and barber shop service is necessary for the accommodation of the roomers in the building.

"The question of the maintenance of a restaurant or eating place in connection with buildings of this kind, for which exemption from taxation was claimed, has been considered by the courts in several cases. In Philadelphia v. Women's Christian Ass'n, supra, in which there was a restaurant in the building, it was held that the building was exempt, notwithstanding the fact that the revenues of the association were, in part, derived from payments for board by those for whose temporal, moral, and religious welfare the association exists, not being intended as a source of profit, and being in fact insufficient to defray expenses, the annual deficit being made up from voluntary contributions. And in Corbin Y. M. C. A. v. Com., supra, it was held that the operation of a restaurant in the building, from which a revenue was derived from members and others, but without profit, was consistent with the charitable purposes of the association. But in Y. M. C. A. v. Keene, 70 N.H. 223, 46 Atl. 186, in which part of the building was rented for a restaurant, with the primary object of obtaining revenue to assist in carrying on the work, and the incidental object of drawing people to the vicinity of the building in order to interest them in the work, it was decided that the association was not entitled to exemption for that portion of the building occupied by the restaurant.

"The conclusion arrived at in the Kentucky case just referred to was based — in part, at least — upon the peculiar language of the Constitution of that state, which exempts 'institutions of purely public charity.' The opinion quotes from a previous decision of the same court to the effect that, since the 'institution' is exempted without any qualifying words showing that the exemption is restricted to property used by or connected with the institution, the exemption applies to the corporate entity, including all its property. In the Women's Christian Ass'n Case, also, the Pennsylvania Constitution exempts the property of all institutions 'maintained by public and private charity.' There is an obvious distinction between such provisions and the provision of our statute confining the exemption to property used exclusively for charitable purposes. The New Hampshire statute upon which is based the decision in Y. M. C. A. v. Keene, supra, holding that portion of the building used for a restaurant to be taxable, exempts the property 'to the extent that it is used for the purposes of the association,' thus laying emphasis upon the use, as does our statute.

"In Y. M. C. A. v. Douglas County, 60 Neb. 642, 52 L.R.A. 123, 83 N.W. 924, in which the first floor of the building was rented for business purposes, the rent being applied to the work of the association, the rented portion was held taxable. In the case at bar certain floor space was leased and the rental went into the general fund of the appellee for the promotion of its purposes. That the object of having the cafeteria there was to derive revenue from its use by the public, together with the appellee's membership, was frankly conceded in the testimony. It was undeniably, to a certain extent, a commercial enterprise, carried on in competition with other similar business that is taxable. The fact that the money derived therefrom was used for the general purposes of the association, or that it was incidentally desirable in the promotion of those purposes, does not alter the fact that it was a use of a portion of the building differing essentially in character from the primary uses and purposes to which the building and the association itself were devoted. Y. M. C. A. v. Douglas County and Y. M. C. A. v. Keene, supra. That portion of the building occupied by the cafeteria was, therefore, not exempt from taxation. The evidence with reference to the barber shop and tailor shop is that they are

accessories required in the building in view of the number of lodgers there, that the amount of space they occupy is insignificant, and that their maintenance is justified in carrying out the general purposes of the association.

"There arises the final question, whether it is feasible to segregate the space occupied by the cafeteria from the rest of the building for the purpose of taxation, and, if so, by what method. In Y. M. C. A. v. Douglas County, supra, it is said:

" 'It is not necessary that the property should be such as to permit of its separation into distinct and definite parcels or tracts of land.'

"In Cleveland Library Ass'n v. Pelton, 36 Ohio St. 253, in which certain rooms on each floor of a building were rented out, and were, therefore, not exempt, it was held:

" 'The fact that the building is so constructed that the part leased, or otherwise used with a view to profit, cannot be separated from the residue by definite lines, is no obstacle to a valuation of such parts for purposes of taxation, having due reference to the taxable value of the entire property.'

"To the same effect is Board of Home Mission v. Philadelphia, 266 Pa. 405, 109 Atl. 664. No reason appears why the taxing authorities cannot arrive at a just valuation of that portion of the building which is taxable, in its relation to the entire property, and assess the property in that amount.

"The judgment of the court below should be reversed, and the cause remanded, with instructions to ascertain the taxable value of the property in accordance with the opinion, and to certify the same to the proper officer according to law."

See, also, 51 Amer. Juris. p. 504, § 498; 61 C. J. p. 472, § 539; 61 C. J. p. 484, § 564; 61 C.J. p. 507-8, § 617, and generally as to the "use" or "exclusive use" of the property, see vol. 2, Cooley on Taxation (4th Ed.) §§ 682, 683, 684, 685, 686, 741, 745, 764, and 776.

From our discussion it is seen that our former decisions to the effect that the Constitution of this state provides tax exemption of property *the income from which, or the net income from which, is* used for charitable or educational purposes, stand almost, if not entirely, alone, and without precedent or authority, nor are they supported by logic, equity, or intimation contained in any provision of our Constitution. Under such decisions any such institution might purchase all the property within a city, county, or state, paying for same entirely from savings from taxes. They could operate any character of business in competition with any other business, entirely tax free. The result would be highly detrimental to the principle of competitive business enterprise, and would constitute serious violation of the uniformity of taxation provisions of the Constitution. The rule taken to its logical conclusion means the surrender in large part of the state's power to tax, at the will of persons who would choose to so arrange their business and property affairs. For the reasons given, such opinions, and any others of like effect, insofar as they conflict herewith, are hereby specifically overruled.

We are convinced that the true rule to be applied to the building involved is that it is prorata or proportionately exempt from taxation and is prorata or proportionately subject to taxation; and that the building and lots should be assessed for ad valorem taxation after the aggregate tax valuation thereof has been ascertained and after there has been deducted therefrom a fair valuation of that portion of the aggregate property which is used separately by the Lodge as heretofore pointed out.

We conclude that such rule is amply sustained by the foregoing reasoning, by our own former decisions last cited, and by the outside authorities above referred to.

The pronouncement of this rule and the overruling of the three decisions above referred to constitutes a definite change in the construction of an important provision of our Constitution. The result is that under this decision property will be taxable which under the

former construction was not taxable. We are aware that such change in construction of our constitutional provision would visit great hardship in many instances unless protection is given property owners as against taxes for back years, which might naturally be thought now to have accrued during the past 37 years since statehood.

Though property owners are likely not possessed of vested property or contract rights in tax exemptions as allowed by our Constitution, it is of course obvious that many property owners have omitted to pay taxes for many years in reliance upon our former opinions. To require payment now with the heavy interest and penalties attached would work extraordinary hardship in a great number of cases, and in many cases would result in financial ruin.

Such resulting hardship constitutes one of the most powerful reasons for the general rule, and the inclination of the courts, to abide by former decisions though wrong.

Though some courts and legal minds differ, we find much respectable authority to the effect that the overruling decision may, in the legal and equitable discretion of the court, be made to operate prospectively only. The rule is almost universal in the protection of property and contract rights. We have heretofore adopted that rule and practice in cases considered proper in Bagby v. Martin, 118 Okla. 244, 247 P. 404, where many authorities are cited.

We think it worth while herein to note some of the authorities supporting the rule affecting protection of property, contract, and other rights, in the discretion of the court. In 21 C.J.S. p. 327, § 194, after stating the general rule, the following appears:

". . . In any event, a court of final decision may expressly define and declare the effect of a decision overruling a former decision, as to whether or not it shall be retroactive, or operate prospectively only, and may, by a saving clause in the overruling decision, preserve all rights accrued under the previous decision."

And again, page 329, same text, the following:

"The foregoing general rule as to an overruling decision having a retroactive effect is subject to the well-settled exception that the construction of the law, as given by the overruling decision, may work prospectively but will not be permitted to retroact so as to impair the obligations of contracts entered into, or injuriously affect vested rights acquired, in reliance on the earlier decision, as where contracts are made or rights acquired in reliance on the construction of a constitutional provision or statute by an earlier decision, which construction is afterward changed by an overruling decision, and this rule has been held to apply to the construction of taxation statutes. . . ."

In Great Northern Ry. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S. Ct. 145, reproduced with notes in 85 A.L.R. 254, Mr. Justice Cardozo, speaking for the U. S. Supreme Court on the question of the right of a court to give prospective effect only to its overruling decisions, says:

" . . . This is a case where a court has refused to make its ruling retroactive, and the novel stand is taken that the Constitution of the United States is infringed by the refusal.

"We think the Federal Constitution has no voice upon the subject. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions. Indeed there are cases intimating, too broadly (cf. Tidal Oil Co. v. Flanagan, 263 U.S. 444, 68 L. Ed. 382, 44 S. Ct. 197, supra), that it must give them that effect; but never has doubt been expressed that it may so treat them if it pleases, whenever injustice or hardship will thereby be averted. . . ." (Here the opinion cites numerous authorities.)

"On the other hand, it may hold to ancient dogma that the law declared by its courts had a Platonic or ideal ex-

istence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been and the reconsidered declaration as law from the beginning." (Here several authorities are cited.)

"The alternative is the same whether the subject of the new decision is common law (Tidal Oil Co. v. Flanagan, 263 U.S. 444, 68 L. Ed. 382, 44 S. Ct. 197, supra) or statute. Gelpcke v. Dubuque, 1 Wall. 175, 17 L. Ed. 520, supra; Fleming v. Fleming, 264 U.S. 29, 68 L. Ed. 547, 44 S. Ct. 246, supra. The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conception of law, its origin and nature. We review not the wisdom of their philosophies, but the legality of their acts. The State of Montana has told us by the voice of her highest court that with these alternative methods open to her, her preference is for the first. In making this choice, she is declaring common law for those within her borders. The common law as administered by her judges ascribes to the decisions of her highest court a power to bind and loose that is unextinguished, for intermediate transactions, by a decision overruling them. . . ."

In State v. Haid, 327 Mo. 567, 38 S.W. 2d 44, the Supreme Court of Missouri, in dealing with change of decision in the construction of a procedural statute, said in part:

" . . . As was said by this court en banc, speaking through Bond, C.J., in Klocke v. Klocke, 276 Mo. 572, 581, 208 S. W. 825, 827, the doctrine of stare decisis should not weigh with us in the abilition of a precedent not sustainable in reason, and in contravention of the terms of the statute relied upon to support it.' We therefore conclude that the former decision of this court in City of Macon v. Atkinson, 266 Mo. 484, 181 S.W. 396, should be expressly overruled.

"The overruling of our former decision in the City of Macon Case should not disturb the rights of those litigants under the Public Service Commission Law who have shaped their course of action in conformity with the rule of practice as laid down in the City of Macon Case. The effect of our decision in the present case, overruling our former decision in the City of Macon Case, is prospective only, and not retroactive, and our decision in the present case is not to be understood or held to affect the rights, positions, actions and procedure of parties litigant in proceedings under the Public Service Commission Law which are pending on motion for new trial in any of the circuit courts of the state, or in which appeals have been allowed and taken to this court at and during the term of the circuit court at which a motion for new trial was ruled, or in which a writ of error has issued from this court. The generally accepted rule is to the effect that the judicial construction of a statute by a court of last resort becomes as much a part of the statute as the text itself, and a subsequent change in the construction of a statute, by judicial decision of the court of last resort, is the same, in effect, as if the statute had been amended by legislative enactment. Mountain Grove Bank v. Douglas County, 146 Mo. 42, 52, 47 S.W. 944. Consequently, the courts have established and adopted the rule that, where a statute or law has received a given construction by a court of last resort, the rights, positions, and course of action of parties who have acted in conformity with, and in reliance upon, such construction of the statute, are not in any wise impaired or disturbed by reason of a change in the construction of the same statute made by a subsequent decision of the court of last resort, in overruling its former decision, and the effect of the change in judicial construction is that it operates prospectively, and not retrospectively, in the same manner as though the statute or law had been amended by the Legislature. 7 R.C.L. 1010, and numerous decisions there cited. Such is the holding and ruling of our own court en banc in Klocke v. Klocke, 276 Mo. 572, 582, 208 S.W. 825. The foregoing rule is, perhaps, more clearly stated in a syllabus to the case of Kelley v. Rhoads, 7 Wyo. 237, 51 P. 593, 39 L.R.A. 594, 75 Am. St. Rep. 904, which syllabus is supported by the text and body of the decision, and is found in 75 Am. St. Rep. loc. cit. 905: 'A judgment of the Supreme Court construing a statute renders it the law for the time being as so construed. Par-

ties have a right to act upon such a decision, and no injury ought to be allowed to result by reason of a dependence thereon as to pending proceedings, if the decision is subsequently changed, any more than in the case of a repeal of a statute."

In Payne v. City of Covington, 276 Ky. 380, 123 S.W. 2d 1045, 122 A.L.R. 321, the Kentucky Court of Appeals held that a court, in overruling a prior adopted principle established by its own earlier decisions, may preserve in the overruling opinion all rights accrued under the prior declaration the same as if they had been created or arose out of a former existing statute later repealed by the Legislature. And that court disposed of the case on appeal by affirming because of the withholding of any retroactive effect of the present opinion overruling prior opinions.

There the court overruled its prior opinions in the matter of constitutional limitations on public indebtedness. Therein the court said:

"Mr. Cooley in his great work on Constitutional Limitations, 8th edition, vol. 1, on page 120, in dealing with the rule as applied to interpretation of Constitutions, says: 'It will, of course, sometimes happen that a court will find a former decision so unfounded in law, so unreasonable in its deductions, or so mischievous in its consequences as to feel compelled to disregard it.'

"In note 2 cited to that text is the case of Union Trust Company v. McGinty, 212 Mass. 205, 98 N.E. 679, Ann. Cas. 1913C, 525. It exhaustively deals with the scope, effect and binding force of the doctrine (stare decisis) and we unhesitatingly recommend it to the reader. The foundation upon which all of the discussion therein made is based is found in this excerpt therefrom: 'The doctrine of stare decisis, like almost every other legal rule, is not without its exceptions. It does not apply to a case where it can be shown that the law has been misunderstood or misapplied, or where the former determination is evidently contrary to reason.'

"Of course, all of the authorities say that more hesitation will be indulged against overruling prior opinions establishing property rights than in cases where such rights are not established. But no case that we have been able to find attributes such binding force to the rule as compels courts to continue to follow prior erroneous opinions to the detriment of the public interest, and when prior erroneous opinions are not only without reason to support them, but are in direct conflict with what was intended by a statute, a Constitution, or by the parties to a contract. . .

"But it might be said that property rights have been created in following our prior interpretations of the sections of the Constitution referred to, and which is true. We conceive, however, it to be competent for a court, in overruling a prior adopted principle, to preserve in the overruling opinion all rights accrued under the prior declaration, the same as if they had been created or arose out of a former existing statute which was later repealed by the Legislature. That right was expressly declared by the Supreme Court of the United States in the case of Great Northern Railway Company v. Sunburst Oil & Refining Company, 287 U.S. 358, 53 S. Ct. 145, 77 L. Ed. 360, 85 A.L.R. 254; . . . (Here the opinion cites numerous authorities.) The right was also approved by us in the case of Oliver v. Louisville Realty Company, 156 Ky. 628; 161 S.W. 570, 51 L.R.A. (N.S.) 293, Ann. Cas. 1915C, 565. See, also, Illinois Cent. Railway Company v. Applegate's Adm'x, 268 Ky. 458, 105 S.W. 2d 153, and the text in 7 R.C.L. page 1010, section 36, which is directly in point and conclusively establishes the authority of our appellate court to preserve prior rights created and emanating from overruled decisions.

"Therefore, in overruling our prior opinions and in declaring our disapproval of such erroneous interpretations herein dealt with, we do so with the express reservation that all rights heretofore created and accrued in favor of all persons interested in any manner whatsoever, shall be preserved and the principles of this opinion will not apply to any transactions begun or in the course

of completion, or finished before this opinion becomes final. . . . As a consequence of the conclusions we have reached, the opinions in the cases of City of Providence v. Providence Electric Light Co., supra, Overall v. City of Maidsonville, 125 Ky. 684, 102 S.W. 278, 31 Ky. Law. Rep. 278, 12 L.R.A. (N.S.) 433; Carter v. Krueger & Son, 175 Ky. 399, 194 S.W. 553, and all others following the interpretations therein made, are hereby expressly overruled; but with the reservation, supra, whereby the rights of all parties are preserved, and this opinion shall have a prospective effect only.

"However, the withholding of any retroactive effect of this opinion requires an affirmance of the judgment, since compliance is shown with the erroneous interpretations heretofore made. Wherefore, the judgment of the lower court is affirmed."

In Warring v. Colpoys, 122 F. 2d 642, 136 A.L.R. 1025, Mr. Associate Justice Vinson, delivering the opinion of the United States Circuit Court of Appeals for the District of Columbia, in discussing the effect and operation of overruling opinions, says: .

"When a case is decided it is expected that people will make their behavior conform to the rule it lays down and also to the principle expressed insofar as it can be determined. This is true whether the decision is regarded as 'the law,' 'the best evidence of the law,' or 'a prediction of what the court will do next time.' When hard cases arise under the principle, counter principles are emphasized, distinctions pointed out, and the determination of what is significant may become easier or more difficult. If, at last, the first decision is overruled, then there is new law, better evidence, or an enlightened basis for prediction. Those transactions which occurred between the two decisions, are, for the most part, accepted history. This is true even though a person had presented, in proper fashion, his case to the courts. His rights being finally determined, an attempt to reopen the question, in view of the new enlightenment, would be greeted with the powerful answer of res judicata. In one respect the new law is applied to an old

set of facts. Traditionally, he who questioned the law or the best evidence of it is given the benefit of the new law or the better evidence of it. This is not always the case. There has arisen, for example, when contract rights or property rights growing out of contracts are involved, the exception that the one who argues against the established law is not given the benefit of the change he helped bring about inasmuch as his adversary relied upon the previous law. Such decisions apply the old law to the case at hand while establishing new law for the future.

"The Supreme Court has found no constitutional limitation on state courts proceeding in this manner. Federal courts have proceeded similarly. Obviously courts are free to follow the more traditional method.

"Now, if a Legislature makes some law, again it is expected that people will conform to its provisions. If a court later construes the Act, it is expected, likewise, that behavior will be adjusted compatibly with the decision even though the court says that the statute means something other than what most people thought that it meant. There would be uncertainty and criticism if each person proceeded to conduct himself according to his own notion of what the statute meant in face of what the court had said. If later the court reverses its construction, a new angle of thought is often injected. There are those who reason that this is different from overruling a common law case. After all, the statute always was the law. It is on a higher plane than the judicial construction of it. Since the two constructions are inconsistent, to be practical, the latter must be chosen as right and the former never was the law. That means that just about everybody was fooled. This reasoning would seem to be more in accordance with the traditional thought habit of the civil law than of the common law although both always tend to modify themselves toward each other. But courts have often concluded that to apply the new construction to a previous transaction would be unjust.

"If instead of a court changing the construction of a statute the Legislature passes a new act which in effect repeals

the old one, there would be little doubt that the old act was the law until the new one was enacted. . . .

"All of the loose ends presented in this discussion on the effect of altering the law can be pretty well tied together when it is realized that law is not a pure science, that law loses its vital meaning if it is not correlated to the organic society in which it lives, that law is a present and prospective force, that law needs some stability of administration, that the law is all the law there is, that law is more for the parties than for the courts, that people will rely upon and adjust their behavior in accordance with all the law be it legislative or judicial or both.

"These considerations should guide the lawmakers and the law appliers in making their determinations in respect of whether a change in the law is to be effective only for the future or also for the past, and if the latter, to what extent. And these considerations should be applicable to both sides of a potential litigation, civil or criminal, so that we may have our rules of the game as we go. . . .

". . . We reject the idea that if a court was considered to have the power in 1939 to do a certain thing under existing statutory construction, and in 1941 that construction is changed so that it no longer has the power to do that thing, it should be concluded that it never had the power in 1939. It has often been said that the living should not be governed by the dead, for that would be too close our eyes to the changing conditions which time imposes. It seems even sounder to say that the living should not be governed by their posterity, for that, in turn, would be downright chaotic."

It is frequently said that a suggested change in the law should be addressed to the Legislature. Indeed, that is ordinarily true. But in cases where the change would require constitutional amendment the change or correction is not so easily accomplished. Courts have sometimes then felt impelled, in cases of obvious mistake, attended with serious consequences, to correct its own errors. Such was the case of Commonwealth of Pennsylvania v. Sunbury Converting Works, 286 Pa. 545, 134 Atl. 438, 48 A.L.R. 922.

Since our former decisions and this overruling decision involve construction of our Constitution, the needed correction of course cannot be made by the Legislature for lack of power in that body to change the Constitution. The Legislature, however, might desire to direct its attention to further legislation giving more detailed directions to tax officers as to assessing and taxing properties taxable under the prorata rule referred to in this opinion.

Upon consideration of all of the foregoing we conclude that the definite duty is upon us to give to this opinion prospective effect only and to rule that the operation of this change in constitutional construction and of this overruling of prior decisions shall be prospective only so as to permit taxation of all properties affected by this rule only in the future without assessment thereof for any back taxes for prior years. And it is so adjudged as to this property and as to all other properties affected by the rule made effective by this change.

Our attention is directed to our former decision in State v. Bartlesville Lodge, 168 Okla. 416, 33 P. 2d 507. There we considered the taxable status of a building owned and used in a manner quite similar to the ownership, occupancy, and use of the building here. There we held the building exempt from taxation under an existing statute, but without considering any question of the constitutionality of such statute because the matter was not presented. Nor did we there consider the applicability of the rule here announced because it was not in any manner called to our attention. It is obvious from the similarity of facts that the rule here adopted might well have been pronounced and applied there had it been urged, or if that case had been presented upon grounds different from the points there presented and determined. It is obvious that the rule of complete tax exemption of the whole building which we there adopted can

no longer stand, in the face of the conclusion here reached, and that conclusion or determination is overruled, subject to the saving provision of prospective application only, and in University Scholarship Corporation v. Parduhn, 180 Okla. 446, 70 P. 2d 84, the language and stated conclusion contrary to this opinion are expressly disapproved and overruled.

The judgment of the trial court ordered the assessment of this building stricken from the tax rolls, which conclusion was correct under the former rule of construction which is here overruled. The trial court's determination must be affirmed because we here withhold from any retroactive effect our overruling of prior decisions. But the conclusion to affirm is only arrived at upon the foregoing considerations and is fully conditioned upon the future taxable status of the property as herein outlined.

For the reasons stated, and upon the consideration and conditions stated, the judgment appealed from is affirmed.

GIBSON, C.J., and RILEY, OSBORN, BAYLESS, DAVISON, and ARNOLD, JJ., concur. HURST, V.C.J., and CORN, J., dissent.

HURST, V.C.J. (concurring in part and dissenting in part). I concur in paragraphs 1, 2, 3, 4, 8, and 11 of the syllabus of the majority opinion. I think paragraphs 5, 7, 9, and 10 of the syllabus are inappropriate. I dissent to paragraph 12 of the syllabus and the result reached.

While the ultimate question for decision is whether the Perrine Building should be stricken from the tax rolls for 1941, there are several intermediate questions that should be decided before that question is reached:

Has the Lodge sustained the burden cast upon it of establishing that it was exempt from taxation for 1941?

Does the fact that all the first eleven floors were rented out and all the income was applied on the mortgage indebtedness, representing the purchase price, deprive the Lodge of its claim of exemption?

Are our decisions in State v. Bartlesville Lodge, 168 Okla. 416, 33 P. 2d 507, and University Scholarship Corp. v. Parduhn, 180 Okla. 446, 70 P. 2d 84, which answer this precise question in the negative, sound? If not, should they be adhered to under the doctrine of stare decisis?

Does the fact that the Lodge receives a regular monthly income of $90 from renting the 12th floor deprive it of the right to claim prorata exemption of that floor?

If any definite part of the 12th floor is exclusively used by the Lodge, is it entitled to a prorata exemption of that portion?

Is the Lodge entitled to claim prospective operation of the rule established by the majority opinion, which is contrary to the former rule?

There are many ramifications to the question as to just what section 6, art. 10, of the State Constitution means, as applied to particular property. The question as to whether any certain property is exempt from taxation is a mixed question of law and fact, and each case should be decided according to the peculiar facts showing the exact use to which the property is devoted. We seem to have gone far afield in several decisions involving tax exemptions, which is due to our failure to keep in mind settled rules of construction. We should re-examine those decisions when the precise questions decided are presented and when we will have before us the parties whose rights will be directly affected by our decisions and when we will also have the benefit of their arguments. We will then be faced with the question of the correctness of those decisions, and, if found to be incorrect, whether we should adhere to them under the rule of stare decisis.

Since we are not here concerned with the question of the exclusive use of income for *educational purposes,* we

should refrain from deciding whether Board of Com'rs v. Phillips University, 144 Okla. 57, 289 P. 720, should be overruled.

And since we are not here dealing with the question of the taxability of a manufacturing or industrial establishment owned and operated by a benevolent institution and not rented out, we should not here overrule Sand Springs Home v. State, 168 Okla. 323, 32 P. 2d 928. No case is cited in the dissenting opinion in that case or in the majority opinion in this case clearly demonstrating the incorrectness of that decision.

And since we are not here concerned with the use of income partly for *charitable purposes* and partly for non-charitable purposes, we should leave Board of Com'rs v. Sand Springs, 185 Okla. 305, 92 P. 2d 376, to be dealt with when that question is presented.

The majority properly refrains from a discussion of the correctness of the decisions in In re Assessment of Beta Theta Pi Corp., 108 Okla. 78, 234 P. 354, Phi Kappa Psi v. State, 175 Okla. 605, 53 P. 2d 1130, and similar cases, holding college fraternity and sorority houses exempt from taxation, which seem to be contrary to the great weight of authority (51 Am. Jur. 600; 61 C.J. 493; 35 A.L.R. 1045) and are largely based upon the erroneous assumption that section 5914 of Wilson's Revised Statutes of Oklahoma of 1903 is still in effect. But those decisions are about as much in point as the three decisions that are overruled in the majority opinion.

The authorities seem to be uniform in holding that, while the rule of stare decisis is subordinate to legal reason and justice, former decisions will not be lightly departed from, and "only urgent necessity or conclusive reasons" are sufficient ground for doing so. 14 Am. Jur. 342; 7 R.C.L. 1008; 15 C.J. 959; 21 C.J.S. 324. Under this rule it would seem that courts should never overrule prior decisions on points not directly in issue, for to do so is to resort to obiter dicta, which is always to be avoided.

The Lodge contends that the building was exempt in 1941 under two statutory provisions and one constitutional provision: (1) Section 5914 of Wilson's Revised Statutes of Oklahoma of 1903, which was carried forward by the proviso to section 6, article 10, of our Constitution; (2) section 12329, O.S. 1931; and (3) that portion of section 6, art. 10, of the State Constitution exempting from taxation "all property used exclusively for religious and charitable purposes." We should dispose of these three contentions, and in doing so we should keep in mind well settled rules of construction to be applied to constitutional and statutory tax exemption provisions.

As is pointed out in the majority opinion, it was well settled in 1907, when our Constitution was adopted, that constitutional and statutory provisions exempting property from taxation should be strictly construed against the one claiming exemption. 12 Am. & Eng. Enc. of Law (2d Ed.) (1899) 302; Cooley on Taxation (3d Ed.) (1903) 357. This is still the rule in practically all jurisdictions. 61 C.J. 329, § 396; 21 R.C.L. 315; 51 Am. Jur. 526-533. It is also the rule in Oklahoma. Oklahoma City v. Shields, 22 Okla. 265, 100 P. 559; Protest of Hyde, 188 Okla. 413, 110 P. 2d 292.

And, while there is some authority to the contrary, the great weight of authority is that the rule of strict construction applies to property used for educational, charitable, and religious purposes. See 51 Am. Jur. 583; 34 A.L.R. 634, at page 635, and 62 A.L.R. 328, at page 329, annotations, citing cases from 16 states in favor of the rule of strict construction as to such properties and cases from two states refusing to apply it in certain instances. We have not, however, followed this rule in the decisions relied upon by the Lodge, nor have we expressly repudiated it.

Following the rule of strict construction against tax exemptions, the rule generally obtaining in the other states in 1907 was that, under statutes and constitutional provisions exempting

from taxation property exclusively used for educational, charitable or religious purposes, neither property not used for any purpose, nor property used for other purposes in connection with those enumerated, nor property rented out though the income is used for one of the enumerated purposes, nor property intended to be used in the future for the enumerated purposes but not presently so used, was exempt from taxation. 12 Am. & Eng. Enc. of Law (2d Ed.) (1899) 318, 322, 323; Cooley on Taxation (3d Ed.) (1903) 350, 353; Washburn College v. Commissioners (1871) 8 Kan. 233, opinion by Justice Brewer. And these rules are still followed by the courts of a great majority of the other states. 26 R.C.L. 326; 51 Am. Jur. 542, 588; 61 C.J. 400, 459, 461; 50 L.R.A. (N.S.) at page 1211, 2 A.L.R. 545; 34 A.L.R. 634, at page 659; 34 A.L.R. 1067, at page 1072; 62 A.L.R. 328, at page 335.

1. Does section 5914 of Wilson's Statutes of 1903 entitle the Lodge to exemption of the Perrine Building, as contended by the Lodge? I think not.

Some of our recent decisions are based upon the assumption that said section 5914 is still in force. See In re Assessment of Beta Theta Pi Corporation, 108 Okla. 78, 234 P. 354 (discussed in note, 54 A.L.R. 1381), State v. Alumnae, 176 Okla. 186, 55 P. 2d 134, and University Scholarship Corporation v. Parduhn, 180 Okla. 446, 70 P. 2d 84. This assumption is clearly erroneous. Section 5914 was superseded by section 2 of the 1909 Tax Code, S.L. 1909, p. 572, section 12319, O.S. 1931, which covered the same subject as that covered by section 5914 and contained additional provisions, and was, therefore, repealed by implication. Hine v. Gokey, 23 Okla. 870, 102 P. 77; In re Application of Jackson, 179 Okla. 577, 66 P. 2d 1101. Furthermore, in 1911 the Revised Laws of 1910 were adopted as a revised Code, and it was provided that "all general or public laws of the State of Oklahoma not contained in said revision are hereby repealed." S.L. 1910-11, chapter 39, page 70. Section 5914 of Wilson's Statutes of 1903 was not included in the 1910 Re-

vised Laws and is no longer in effect. It only confuses the issue to continue to refer to section 5914.

2. Was the Perrine Building exempt from taxation in 1941, under section 12329, O.S. 1931 (repealed in May, 1941, S.L. 1941, page 333), which purported to exempt from taxation real estate belonging to fraternal orders, rented out and the "net proceeds" from which were "devoted exclusively to benevolent or charitable purposes," as argued by the Lodge? I think not.

It is clear that section 6, art. 10, of the Constitution of Oklahoma is self-executing (61 C.J. 385; 51 Am. Jur. 506), and the Legislature can neither restrict nor enlarge the exemptions therein provided. The constitutionality of section 12329, O.S. 1931, was doubtful. But, assuming that it was constitutional, the "net proceeds" (the amount left after paying the upkeep and operating expenses, Bouvier's Law Dictionary, Rawles Third Revision, page 2332) were here used to pay part of the purchase price. They were not "devoted exclusively to benevolent or charitable purposes" within the purview of section 12329. The decisions in State v. Bartlesville Lodge and University Scholarship v. Parduhn, above, were clearly in error in assuming that the net proceeds in those cases were devoted exclusively to benevolent or charitable purposes so as to make section 12329 applicable, even if constitutional.

3. Is the Perrine Building being used exclusively for charitable purposes so as to exempt it from taxation under section 6, art. 10, of the State Constitution, as argued by the Lodge? I think not.

Until the purchase price is fully paid all or part of the income will be used to pay the mortgage indebtedness, which represents the purchase price. The most that can be said in behalf of the Lodge is that when the purchase price is fully paid the income will be used for charitable purposes. Under the rules above stated, it would seem that the present use of the income to pay the purchase

price with an intention to use the income exclusively for charitable purposes in the distant future, if and when the purchase price is fully paid, should not entitle the Lodge to the exemption. The courts of Missouri, Kansas, and New York have passed upon this precise question, and they all hold that, in harmony with the rules above stated and under substantially the same exemption provision, the property is not exempt from taxation. See Fitterer v. Crawford, 157 Mo. 51, 57 S.W. 532, 50 L.R.A. 191; Summunduwot Lodge v. Spaeth, 81 Kan. 894, 106 P. 1077; People v. Purdy, 167 N.Y.S. 285, affirmed in 121 N.E. 885.

In State v. Bartlesville Lodge and University Scholarship Corp. v. Parduhn, above, without apparently considering the rules of construction above stated, the decisions last cited, or the meaning of section 6, art. 10, of the State Constitution, this court held that use of income to pay the purchase price would exempt the property from taxation. These decisions are squarely in point here and the Lodge properly relies upon them. They disregard the well settled rules of construction, above stated. And, under established exceptions to the rule of stare decisis, hereinafter mentioned, they should be overruled.

4. The Lodge has not sustained the burden of showing that the 12th floor is not subject to taxation so that the value of the 12th floor should be deducted from the value of the entire property in fixing the assessed valuation, as was its duty. 51 Am. Jur. 530. The parties do not argue this point. The record discloses that the Lodge receives a regular income of $90 per month from renting the 12th floor. It does not disclose whether any certain portion of the 12th floor is exclusively used by the Lodge, or, if so, the value of such portion. Under these circumstances, and assuming that, despite the rule of strict construction of section 6, art. 10, of our Constitution, a portion used exclusively for one of the designated purposes should be held to be exempt from taxa-

tion and credit therefor given on the value when assessing the property even without statutory authority (51 Am. Jur. 589, 605; 22 A.L.R. at 924; 34 A.L.R. at 660, 661, citing cases decided prior to the adoption of our Constitution), the Lodge has not shown that it is entitled to exemption on the value of the 12th floor. People v. Sayless, 53 N.Y.S. 65, 67; Portland Hibernian Ben. Sov. v. Kelly, 28 Ore. 173, 42 P. 3. Furthermore, there is grave doubt as to whether any part of the 12th floor is being used "exclusively for charitable purposes" within the purview of our constitutional provision. See 22 A.L.R. 907, 83 A.L.R. 773, annotations.

5. The Lodge urges that we should adhere to the rules stated in our prior decisions under the doctrine of stare decisis and relieve the Perrine Building from taxation. It makes a strong argument on this point. The rule of stare decisis is sound and makes for certainty and stability in the law, and decisions should be departed from only for cogent reasons (Inman v. Sherrill, 29 Okla. 100, 116 P. 426; 14 Am. Jur. 288), but the rule should not be used to perpetuate palpable error, especially where, as here, the prior decisions ignored settled rules of construction and are violative of the letter and spirit of the Constitution, and where more harm will be done by following such erroneous decisions than by overruling them. 7 R.C.L. 1008; 14 Am. Jur. 287, 291, 341-345; 15 C.J. 956-959; 21 C.J.S. 322-326; Weaver v. First Nat. Bank, 76 Kan. 540, 94 P. 273, 16 L.R.A. (N.S.) 110, 123 Am. St. Rep. 155. And the question of whether the rule shall or shall not be followed in any particular case rests in the sound discretion and judgment of the court. Equality in the tax burden is and should generally be the rule. To relieve this revenue-producing property of the $25,624.28 taxes imposed on it for 1941 and a similar sum for each of the future years for an indefinite period of time would be to impose that burden upon the other taxable property in Oklahoma county, including office buildings in competition with the Perrine Building, and would be violative

of the equality and uniformity theory of taxation enjoined upon us by the State Constitution. In fact, the effect of exempting it from taxation would be that the property taxpayers would be indirectly paying part of the purchase price by relieving the property from taxes, permitting the Lodge to apply the sums so saved on the purchase price, and placing that burden upon the other taxable property in Oklahoma county. It is largely because of the desirability of equality and uniformity that the courts almost universally adhere to the rule of strict construction of tax exemptions allowed by statutes and Constitutions and resolve all reasonable presumptions against the surrender of the taxing power. 51 Am. Jur. 529.

In Fitterer et al. v. Crawford, above, the Missouri court quoted from Bangor v. Masonic Lodge, 73 Me. 428, 40 Am. Rep. 369, this pertinent language:

"The just and honest rule in assessments for governmental purposes is equality of taxation. Whatever sacrifices it requires from the people should be made to bear as nearly as possible with the same pressure upon all. In this way only will there be the least sacrifice by all. If one bears less than his share of the public burdens, some other must bear more. If one block of stores remains untaxed, the remaining stores and other taxable property must be unduly and disproportionately taxed. The more numerous the exemptions, the more unequal and burdensome the taxation."

I agree that the just rule is that when decisions construing the Constitution or statutes are overruled, the overruling decision should ordinarily be given prospective effect as regards property or contract rights acquired on the strength of the overruled decisions (7 R.C.L. 1010; 14 Am. Jur. 345, § 130; 21 C.J.S. 327; 85 A.L.R. 262, annotation), and I believe this rule might well be applied to properties that have in good faith been left off the tax rolls on the strength of our prior decisions, in order to prevent great hardship and the confiscation of property. The rule is one of expediency and should be applied with caution. It is an exception to the general rule that overruling decisions operate retrospectively. This question is not argued by the parties. I do not believe, however, that there are such equities in this case as to justify the application of the exception. This valuable property had always been on the tax rolls prior to 1941. The lodge paid no cash consideration in the purchase of the property. The mortgagees retained control of all but the 12th floor and the income therefrom. Most of the mortgages now on the property were on it when it was clearly taxable and on the tax rolls. The mortgagees are now the chief beneficiaries of the tax exemption and will continue to be until the mortgages are paid. The Lodge and mortgagees have known since December, 1941, that the county was contending that it was taxable, and should have laid aside enough of the income to pay the taxes if such contention should be sustained. The income from the property in 1941 was not sufficient to pay the interest and the accruals on the principal of the mortgages. The property was in distress when the Lodge purchased it, and it is probable that, if the building must carry the tax burden in the future, the Lodge will be compelled to turn it back, in which event the mortgagees and former owners would be the beneficiaries of our generosity in remitting the taxes for 1941 and the subsequent years, amounting to approximately $125,000, and they clearly do not come within the exemption provision of our Constitution. The county has prosecuted this appeal to collect the taxes, not merely to get a rule of law established. It is unfair to the other owners of taxable property in Oklahoma county, and contrary to the public interest, to permit the property to escape taxation for those years under the circumstances just stated. It is my view that, when there is a conflict between public and private rights, the doubt should be resolved in favor of the public.

The fact that the rules stated in the majority opinion are to be made to operate prospectively as to similar property, held under different circum-

stances, and which the taxing officers have made no attempt to place on the tax rolls, is no justification for exempting this property from taxation for the five-year period.

The rule of stare decisis and the rule of prospective operation of the overruling decision are closely akin to the doctrine of estoppel. 15 C.J. 959; 21 C.J.S. 326. The question of exemption of the Perrine Building from taxation was only incidentally involved in the contract of purchase. To now overrule the decisions on which the parties to the contract relied is not to invalidate the purchase contract but to make it less valuable to the Lodge, for it must be conceded that a property that is burdened with an annual tax bill of $25,000 is worth much less than one not so burdened. The majority opinion applies the doctrine of prospective operation for the period up to January 1, 1946, but refuses to apply it thereafter. I would refuse to apply it at all for the reasons above stated.

I conclude that the decisions in State v. Bartlesville Lodge and University Scholarship Corporation v. Parduhn, above, should be overruled. The Perrine Building should not be given exemption, in whole or in part, from taxation for 1941 and the subsequent years. It was not "used exclusively for . . . charitable purposes" within the purview of section 6, art. 10, of the State Constitution and the second subdivision of section 12319, O.S. 1931. It was not "devoted solely" to the objects of the Lodge as a benevolent institution, or used exclusively for charitable purposes, within the purview of the 10th subdivision of section 12319, O.S. 1931. The "net proceeds" were not devoted exclusively to benevolent or charitable purposes within the purview of section 12329, O.S. 1931.

CORN, J. (dissenting). I have carefully considered this case and I am of the opinion that the purported sale and purchase of the property involved in this action was solely for the purpose of getting it off the assessment rolls and avoiding the payment of taxes; therefore, it was not a good faith transaction and this court should so hold.

I respectfully dissent.