2012 OK 59

**AOF/SHADYBROOK AFFORDABLE HOUSING CORPORATION, an Oklahoma not-for-profit corporation, Plaintiff–Appellee,**

v.

**Ken YAZEL, Tulsa County Assessor,**

and

**Tulsa County ex rel. Tulsa County Board of Equalization and Dennis Semler, Tulsa County Treasurer, Defendants–Appellants.**

No. 107,508.

Supreme Court of Oklahoma.

June 19, 2012.

AS Corrected on Rehearing July 16, 2012.

Mark R. Reents, Clark & Williams, Tulsa, Oklahoma, for Plaintiff–Appellee.

Leisa S. Weintraub, Tulsa County Assessor's Office, Tulsa, Oklahoma, for Defendants–Appellants.

### Facts & Procedural History

GURICH, J.

¶1 This is an appeal from the Journal Entry of Judgment, filed on September 22, 2009, in Tulsa County, Honorable P. Thomas Thornbrugh.[3] The case involves the assessment of ad valorem taxes on the Shadybrook Apartments for the years 2004, 2005, and 2006.[4] AOF/Shadybrook Affordable Housing Corporation is an Oklahoma not-for-profit corporation.[5] In 1998, AOF acquired Shadybrook using proceeds from the sale of Tulsa County Industrial Revenue Bonds. The income from those bonds is exempt from federal income tax.[6]

¶2 The Shadybrook apartment complex is located in Tulsa and consists of 120 one-bedroom apartment units. Shadybrook was rented almost exclusively to persons of little financial means who were either disabled or over the age of sixty-two (62). Annual Department of Housing and Urban Development Income Guidelines were used in determining tenant eligibility. Income of the tenants at Shadybrook fell primarily in the "Extremely Low" and "Very Low" income categories for the years 2004, 2005, and 2006.[7]

---

3. On March 28, 2009, the trial court issued a thirty-five page final order in the case, which included extensive findings of fact and conclusions of law. On April 2, 2009, the Assessor filed a Motion to Correct, Modify, Vacate or Reconsider Final Order. On September 22, 2009, the trial court issued a Journal Entry of Judgment in the case, denying the Assessor's motion and incorporating by reference its Final Order issued on March 28, 2009.

4. Because the issues were the same for all three years, the trial court consolidated the cases.

5. AOF is a subordinate of The American Opportunity Foundation, Inc., a Georgia 501(c)(3) corporation, which is exempt from federal income taxation under § 501(c)(3) of the Internal Revenue Code and which receives a group exemption as a central organization whose subordinates are recognized as exempt from federal taxation under § 501(c)(3).

6. The Tulsa County Industrial Authority is an entity organized pursuant to 60 O.S. § 176.

7. In 2004, 90% of the tenants were categorized as either extremely low or very low; in 2005, 98% of the tenants were categorized as extremely low or very low; and in 2006, 95% of the tenants were categorized as extremely low or very low.

¶ 3 The fair market rent established for Shadybrook was $559.00 per month. While the rent paid by every tenant was based on his or her ability to pay, all tenants were required to pay a minimum $25.00 contribution. Except for one or two HUD-approved tenants who paid fair market rent, no tenant paid the total cost of rent. The rent receipts collected at Shadybrook were applied to the upkeep, maintenance, and equipment of the Shadybrook Apartments, and all residents occupying Shadybrook received the same treatment, regardless of the amount of rent they paid.[8]

¶ 4 From 1998 through 2003, the Tulsa County Assessor granted Shadybrook an ex-emption from ad valorem taxation pursuant to 68 O.S. § 2887(8) because Shadybrook was organized as a charitable institution and sat-isfied the income standards of IRS Revenue Procedure 96–32.

¶ 5 However, in 2003, § 2887(8) was amended to exclude properties acquired or improved with proceeds from the sale of federally tax-exempt bonds.[9] Because Shad-ybrook was acquired with proceeds from the sale of federally tax-exempt bonds, the As-sessor's office assessed ad valorem taxes on Shadybrook beginning in 2004 and ending in October of 2006 when AOF sold the proper-ty.[10] The taxes assessed against Shadybrook

Shadybrook's occupancy manager testified that during 2004, 2005, and 2006, extremely low in-come for one person would have been a gross annual income between $0 and $11,450.00. Very low income for one person would have been a gross annual income between $11,450.00 and $19,100.00.

8. The difference between what the tenant was charged and the fair market rent was the subsidy Shadybrook received from HUD, which allowed Shadybrook to continue to make the apartments available to low-income clients.

9. 68 O.S.2004 § 2887(8)(a)(2)(b) provides:

The following property shall be exempt from ad valorem taxation:

. . . .

8. All property of any charitable institution organized or chartered under the laws of this state as a nonprofit or charitable institution, provided the net income from such property is used exclusively within this state for charitable purposes and no part of such income inures to the benefit of any private stockholder, includ-ing a property which is not leased or rented to any person other than a governmental body, a charitable institution or a member of the gen-eral public who is authorized to be a tenant in property owned by a charitable institution un-der § 501(c)(3) of the Internal Revenue Code and which includes but is not limited to an institution that either:
a. additionally satisfies the income standards set forth in Internal Revenue Service Revenue Procedure 96–32, which may be audited by the county assessor of the applicable county, in addition to other requirements of this subpara-graph, as a condition of obtaining and main-taining the exemption, if:
(1) the property provides residential rental ac-commodations regardless of whether services or meals are provided, and
(2) the property:

(a) is occupied as of the applicable January 1 assessment date if the structure is a single-family dwelling, or
(b) has an average seventy-five percent (75%) occupancy rate, based upon the total number of units suitable for occupancy, during the calendar year preceding the applicable Janu-ary 1 assessment date if the property contains multiple structures suitable for multi-family housing. The owner of any property subject to the occupancy requirements prescribed herein shall submit a report to the county assessor of the county in which the property is located no later than December 15 each year regarding the occupancy rate for the preceding eleven (11) months. If the report indicates that the average occupancy rate was less than seventy-five percent (75%), the county assessor shall determine the taxable value of the property for the succeeding assessment year and the prop-erty shall not be exempt for any subsequent assessment year unless the average occupancy rate is at least seventy-five percent (75%) dur-ing the succeeding eleven-month period. *No asset consisting of a single-family or multi-family dwelling unit owned by an entity the property of which would otherwise be exempt pursuant to subparagraph a of this paragraph shall be exempt from ad valorem taxation if any such dwelling unit was improved with or ac-quired with any portion of proceeds from the sale of obligations issued by any entity orga-nized pursuant to Section 176 of Title 60 of the Oklahoma Statutes if the interest income derived from such obligations is exempt from federal income tax* .... 68 O.S.2004 § 2887(8)(a)(2)(b) (emphasis added).
The amendment became effective January 1, 2004.

10. The years in question regarding this dispute are (1) the taxes for calendar year 2004, begin-ning on January 1, 2004, and ending on Decem-ber 31, 2004; (2) the taxes for calendar year 2005, beginning January 1, 2005, and ending December 31, 2005; and (3) the taxes for a

were $41,530.00 in 2004; $39,847.00 in 2005; and $40,847.00 in 2006. Shadybrook, under protest, timely paid the taxes each year, but appealed the Assessor's valuation to the Tulsa County Board of Tax Roll Corrections and the Tulsa County Board of Equalization.[11]

¶ 6 At each administrative hearing, Shadybrook objected to being taxed, claiming exemption from ad valorem taxation under Article 10, § 6A of the Oklahoma Constitution. The Assessor's office argued that since Shadybrook was acquired with proceeds from the sale of federally tax-exempt bonds, Shadybrook was not exempt from ad valorem taxes under 68 O.S.2004 § 2887(8)(a)(2)(b). Both Boards denied Shadybrook's request for exemption from payment of ad valorem taxes. Shadybrook timely appealed the Boards' rulings to the district court of Tulsa County.

¶ 7 On appeal to the district court, the parties did not dispute that Shadybrook fell within the exception to exemption stated in 68 O.S.2004 § 2887(8)(a)(2)(b). However, Shadybrook argued that the exception was invalid under the Oklahoma Constitution because it imposed stricter requirements for exemption from ad valorem taxation than those set by the Oklahoma Constitution.[12] Although the Assessor treated Shadybrook as a charitable institution from 1998 to 2003, the Assessor argued in response that even if the statute imposed greater burdens on the exemption than allowed by the Constitution, the property was not being used for charita-

ble purposes and not exempt from ad valorem taxes.

¶ 8 The trial court granted Shadybrook's motion for summary judgment, finding that 68 O.S.2004 § 2887(8)(a)(2)(b) imposed impermissible barriers on the exemption of property in charitable use beyond those provided for in Article 10, § 6A of the Oklahoma Constitution. The Assessor appealed.

¶ 9 In the first appeal in this case, the Court of Civil Appeals held that *"if AOF's use of Shadybrook constitute[d] a charitable purpose,* then § 2887(8)(a)(2)(b) would impose a greater burden on the receipt of the Article 10, § 6A charitable exemption than does the Constitution."[13] COCA upheld the trial court's ruling in part but reversed and remanded for further proceedings in the trial court to determine the factual issue of whether Shadybrook's use of the property was for charitable purposes under Article 10, § 6A, "so as to overcome the Supreme Court's ruling in *London Square Village v. Okla. County Equalization and Excise Board.*"[14]

¶ 10 On remand, the trial court held a bench trial to determine these issues. The trial court held that Shadybrook was "physically dedicated to a charitable purpose" under Article 10, § 6A of the Oklahoma Constitution and that Shadybrook's use of the property during 2004, 2005, and 2006 did not fall under the rule announced by this Court in *London Square Village.* The Assessor's office timely appealed this judgment, filing a

portion of calendar year 2006, beginning on January 1, 2006, and ending on October 31, 2006.

**11.** Shadybrook properly and timely filed all appeals before the Boards.

**12.** To be exempt from ad valorem taxation under Article 10, § 6A of the Oklahoma Constitution, a property must be used exclusively for charitable purposes. To be exempt from ad valorem taxation under 68 O.S.2004 § 2887(8)(a)(2)(b), a property must qualify as charitable *and* not be funded by proceeds from the sale of federally tax-exempt bonds. Shadybrook argues that 68 O.S. 2004 § 2887(8)(a)(2)(b)'s additional requirement excluding property funded with proceeds from the sale of federally tax-exempt bonds from ad valorem exemption imposes stricter requirements for exemption than required by the Oklahoma Constitution. For this Court to declare the statute unconstitutional, Shadybrook must demonstrate that its use of the property was charita-

ble under the Oklahoma Constitution. *See In the Matter of the Assessment of Real Prop. of Integris Realty Corp.,* 2002 OK 85, 58 P.3d 200.

**13.** *AOF/Shadybrook Affordable Housing Corp. v. Ken Yazel, et al.,* Case No. 105,645, at 11 (June 20, 2008) (unpublished) (emphasis added).

**14.** *Id.* at 18. On the first appeal in this case, the Assessor also argued that AOF was forbidden under the trust code to use tax-exempt property for the housing project. COCA found that the Assessor's argument failed to disclose how a violation of the trust code was determinative of whether the property qualified for the charitable use tax exemption. COCA affirmed the trial court on this issue. Additionally, AOF conceded that a small fraction of its property did not qualify for the charitable exemption, so the trial court calculated the fraction and the tax. COCA also affirmed this portion of the trial court's order.

Petition in Error and a Motion to Retain the appeal in the Supreme Court. This Court granted the Assessor's motion on November 16, 2009, and retained the appeal.[15]

### Standard of Review

¶ 11 Whether property is being used exclusively for charitable purposes so as to qualify for the Article 10, § 6A exemption from ad valorem taxation presents a question of law concerning the scope of the constitutionally mandated exemption. *Integris,* 2002 OK 85, ¶ 6, 58 P.3d at 203. Questions of law are reviewed de novo, which necessitates a plenary, independent, and non-deferential examination of the trial court's legal rulings. *Id.* This Court has long held that whether property is exempt from taxation under Article 10, § 6A depends on whether it was actually used for charitable purposes as determined by the facts in evidence and that each case must stand on its own merits. *In re Farmers' Union Hosp. Ass'n of Elk City,* 1942 OK 128, ¶ 8, 126 P.2d 244, 246.[16] The burden of proving the existence of an exemption is on the individual seeking the exemption, and constitutional provisions are strictly construed against those claiming the exemption. *Austin, Nichols & Co. v. Okla. Cnty. Board of Tax–Roll Corrections,* 1978 OK 65, ¶ 19, 578 P.2d 1200, 1203–04.

### Analysis

¶ 12 Article 10, § 6, subsection A, of the Oklahoma Constitution states: "Except as otherwise provided in subsection B of this section, all property used for free public libraries, free museums, public cemeteries, property used exclusively for nonprofit schools and colleges, and all property used

exclusively for religious and charitable purposes ... shall be exempt from taxation." [17] In this Court's most recent discussion of the charitable use exemption in *Integris,* several Integris-related nonprofit, charitable entities used office space in a multi-story office building for charitable, educational, and scientific purposes and sought a pro rata exemption from ad valorem taxation. *Integris,* 2002 OK 85, ¶ 2, 58 P.3d at 202. Even though the entity that owned the building was not a charitable organization and part of the building was leased to for-profit entities that were not charitable, this Court allowed an exemption for the portion of the building that was physically used for charitable purposes. *Id.* ¶ 16, 58 P.3d at 206. We stated that the proper interpretation of the words "used exclusively for charitable purposes" in Article 10, § 6 is "the use to which the property is dedicated and devoted." *Id.* ¶ 9, 58 P.3d at 204. Physical use to which the property is dedicated and devoted is determinative. *Id.*

¶ 13 While *Integris* reaffirmed that the physical use of the property determines whether an entity is charitable under Article 10, § 6, the facts in that case differ significantly from the facts of today's case. *London Square Village* is factually similar to today's case. Because *London Square Village* provides only limited guidance, the trial court, in deciding whether Shadybrook used the property for a charitable purpose, applied a seven-factor test this Court cited favorably in *Glass v. Oklahoma Methodist Home for the Aged,* 1972 OK 135, ¶ 21, 502 P.2d 1268, 1273, and later in *Baptist Health Care Corp. v. Okmulgee County Board of Equalization,* 1988 OK 11, ¶ 10, 750 P.2d 127, 130 n. 3.[18]

---

**15.** The case was assigned to my chambers for review on February 24, 2011.

**16.** *See also Immanuel Baptist Church v. Glass,* 1972 OK 79, ¶ 12, 497 P.2d 757, 760; *Okla. Cnty. v. Queen City Lodge No. 197,* 1945 OK 55, ¶ 22, 156 P.2d 340, 346.

**17.** Okla. Const. art. X, § 6.

**18.** Both in *Glass* and *Baptist Health Care Corp.,* this Court cited the Oregon Supreme Court's decision in *Oregon Methodist Homes, Inc., v. Horn,* 226 Or. 298, 360 P.2d 293, 298–303 (1961), where the Oregon Supreme Court listed

these seven factors to consider in determining whether a property is being used exclusively for charitable purposes. The factors include: (1) are rent receipts applied to upkeep, maintenance, and equipment of the institution? (2) do residents receive the same treatment, regardless of race, creed, color, religion, or ability to pay? (3) are the facilities open to all, regardless of race, creed, color, religion, or ability to pay? (4) are charges made to all residents and, if made, are lesser charges made to the poor or are any charges made to the indigent? (5) is there a charitable trust fund created by benevolent and charitably minded persons for the needy or are donations made for the use of such persons? (6)

¶ 14 This seven-factor test is precedential authority in charitable use exemption cases involving care centers for the elderly, like those in *Glass* and *Baptist Health Care Corp.*, and we expressly adopt it today as authority in cases involving low-income housing complexes. We reiterate, however, that the physical use to which the property is dedicated and devoted is determinative and that these factors are only relevant *to the extent they indicate whether the questioned entity's physical use of the property is dedicated and devoted to a charitable purpose.* See *Integris* 2002 OK 85, ¶ 9, 58 P.3d at 204.

¶ 15 The parties agreed, and the trial court found, that only three of the seven factors were disputed: (1) Were the Shadybrook facilities open to all regardless of ability to pay? (2) Were donations made for the use of needy persons? (3) Did Shadybrook operate without a profit or private advantage to its founders and officials in charge?

## Shadybrook Facilities Were Open to All Regardless of Ability to Pay

¶ 16 The trial court first addressed whether the Shadybrook facilities were open to all regardless of ability to pay. The Assessor argued that Shadybrook was not open to all regardless of their ability to pay because HUD rules required tenants, even those with no apparent incomes, to pay a $25.00 per month contribution for operating costs of the facility.

¶ 17 Assistance does not have to be cost-free for an organization to qualify as an exclusively charitable organization, and a minimum contribution from residents does not preclude an organization from having a charitable purpose. In *Tulsa County v. St. John's Hospital,* 1948 OK 84, 191 P.2d 983, we held that a hospital owned and managed by a corporation organized for benevolent purposes, which had no capital stock, divi-

dends, salary, wage, or pecuniary profits, which devoted all its income to caring for the sick and injured, and which received and cared for patients without discrimination, was a charitable institution regardless of the fact that it charged and received pay for patients able to pay. Other jurisdictions have also found that assistance does not have to be cost free for an organization to qualify as an exclusively charitable organization.[19]

¶ 18 In this case, the record reflects that all Shadybrook residents received the benefits provided by the complex regardless of whether they could make the required minimum contribution. Shadybrook's occupancy manager testified that even though each tenant paid a different amount of reduced rent, all tenants received the same services regardless of the amount of rent they paid. In fact, the trial court found that Shadybrook extended its benefits to some individuals who could not make the reduced rent payments. The trial court was correct in concluding that the Shadybrook facilities were open to all regardless of ability to pay.

## Regardless of Federal Funding, Shadybrook's Purpose Was Charitable

¶ 19 The trial court next addressed whether there were donations made for the use of needy persons. The Assessor argued that because operational expenses and debt service were paid almost entirely with HUD subsidies, Shadybrook's use of the property for low-income housing was not for a charitable purpose.

¶ 20 We recently considered the charitable use exemption in *Integris:*

> The framers of Oklahoma's Constitution no doubt were mindful that charitable institutions ... *provide services which relieve the State of burdens which it would otherwise have to bear* and in crafting the art. 10, § 6

---

does the institution operate without a profit or private advantage to its founders and officials in charge? (7) do the articles or bylaws of the corporation make provision for the disposition of surplus assets upon dissolution? *Baptist Health Care Corp.,* 1988 OK 11, ¶ 10, 750 P.2d at 130 n. 3.

19.  *See, e.g., Yorgason v. Cnty. Bd. of Equalization of Salt Lake Cnty., ex rel. Episcopal Mgmt. Corp.,* 714 P.2d 653, 660 (Utah 1986); *Santa Catalina Island Conservancy v. Cnty. of Los Angeles,* 126 Cal.App.3d 221, 178 Cal.Rptr. 708, 716 (1981); *Belle Harbor Home of the Sages v. Tishelman,* 100 Misc.2d 911, 420 N.Y.S.2d 343, 345 (1979); *Martin Luther Homes v. Cnty. of Los Angeles,* 12 Cal.App.3d 205, 90 Cal.Rptr. 524, 527 (1970).

tax-exemption intended to foster such charitable acts.... In recognition of the burden on state government which is lifted by the charitable acts of others, the framers allow an exemption from taxation for property which is "used exclusively"—i.e. property which is physically dedicated and devoted-for charitable purposes.[20]

¶ 21 In this case, the record indicates that Shadybrook's use of HUD subsidies to operate the apartment complex reduced the burden that might otherwise rest on the State of Oklahoma to provide such low-income housing to the elderly and disabled population. In tax years 2004, 2005, and 2006, only three tenants were financially capable of paying and were charged fair market rent. The remaining 118–119 tenants paid substantially lower rent than fair market rent. Without the HUD subsidies, only three of the approximately 120 tenants could have lived at Shadybrook. The HUD subsidies alone allowed Shadybrook to continue to make the apartments available to its elderly and disabled tenants while still paying its operating expenses. From the perspective of the tenants, Shadybrook provided a safe and decent place to live; it made no difference to them whether funding came from a private citizen or via the federal government. We find that regardless of the source of the funding, the end result in this case furthered Shadybrook's charitable purpose and relieved the State of Oklahoma of burdens it might otherwise have to bear.

### Shadybrook Did Not Operate to the Private Advantage of Founders or Officials in Charge

¶ 22 Finally, the trial court addressed whether Shadybrook operated without a profit or private advantage to its founders and officials in charge. The Assessor argued that Shadybrook may have operated to the private advantage of Jack T. Hammer, a majority stockholder in the HSI Company, which provided management services to Shadybook.

¶ 23 The record indicates that AOF President, Phil Kennedy testified that HSI was entitled to a maximum one percent (1%) of the gross revenues of the Shadybrook complex in return for its management services.[21] Mr. Kennedy testified that this typically amounted to between five and six hundred dollars per month, or approximately five dollars per apartment. However, he also testified that no actual payment had been made to HSI during any of the tax years in question because the economic conditions of the property would not support the payment. Mr. Kennedy further testified that the HSI payments had accrued, however, and could potentially be claimed in the future.

¶ 24 The record is clear that during the tax assessment years in question, Mr. Hammer did not receive any private gain because no actual payment was made to HSI during 2004, 2005, or 2006. The economic conditions of the property could not support the payment. Additionally, it is not clear from the record whether Mr. Hammer will ever receive the payments under the HSI management contract. As such, we find that because Mr. Hammer did not receive private gain during the tax assessment years in question, this factor does not preclude Shadybrook from the claimed constitutional exemption.

20. See also Cox v. Dillingham, 1947 OK 250, ¶ 17, 184 P.2d 976, 979–80. "[O]ur Constitution ... is · plain and unambiguous, and ... it is apparent that the framers of that instrument sought to encourage and assist institutions of learning and charitable and other institutions, which are beneficial to the state, and to some extent relieve the government of some of its burdens." (emphasis added). Jurisdictions are split on the question of whether federal funding is the equivalent of outside private donations when determining whether an entity has a charitable purpose. See, e.g., Housing Southwest, Inc. v. Washington Cnty., 128 Idaho 335, 913 P.2d 68, 72 (1996) (there is no legislative direction that indicates federal subsidies qualify as donations); Yorgason, 714 P.2d at 657, 660 (use of the property is determinative, and it is irrelevant that the government, rather than a private benefactor, makes up the deficit); Franciscan Tertiary Province v. State Tax Comm'n, 566 S.W.2d 213, 223 (Mo.1978) (federal subsidies have the same effect as charitable contributions from the private sector).

21. The HSI management contract was HUD-approved and at a fair market rate for the services provided.

### The Trial Court Correctly Prorated a Portion of the Complex for Tenants Who Paid Fair Market Rent

¶ 25 After weighing these factors and determining that Shadybrook's use of the property was for a charitable purpose under the Oklahoma Constitution, the trial court addressed whether the presence of a small number of tenants who paid the fair market rent affected Shadybrook's tax-exempt status. Oklahoma precedent on this issue is clear. Non-charitable use of a portion of a property otherwise dedicated to a charitable use results in pro rata taxation of the non-charitable portion. *Integris*, 2002 OK 85, ¶ 11, 58 P.3d at 204; *Oklahoma Cnty. v. Queen City Lodge No. 197*, 1945 OK 55, ¶ 62, 156 P.2d 340, 354. We find the trial court was correct in prorating a portion of the complex based on the tenants who paid fair market rent.[22]

### London Square Village Is Overruled

¶ 26 Since *London Square Village* was decided in 1976,[23] the Oklahoma Legislature has amended the ad valorem tax code to exempt from ad valorem taxation low-income housing complexes that satisfy the statutory requirements. In 1988, 68 O.S. §§ 2401 et seq. was repealed and replaced by 68 O.S.

§§ 2801 et seq. Included in the new ad valorem tax code was § 2887.[24] As originally enacted, it provided:

> The following property shall be exempt from ad valorem taxation:
>
> . . . .
>
> 8. All property of any charitable institution organized or chartered under the laws of this state as a nonprofit or charitable institution, provided the net income from such property is used exclusively within this state for charitable purposes and no part of such income inures to the benefit of any private stockholder. 68 O.S.1992 § 2887(8).

In 2000, § 2887 was amended to read:

> The following property shall be exempt from ad valorem taxation:
>
> . . . .
>
> 8. All property of any charitable institution organized or chartered under the laws of this state as a nonprofit or charitable institution ... *which additionally satisfies the income standards set forth in Internal Revenue Service Revenue Procedure 96–32* if the property provides residential rental accommodations regardless of whether services or meals are provided. 68 O.S.2001 § 2887(8) (emphasis added).[25]

---

**22.** After prorating the portions of the property not dedicated to a charitable use, the trial court found that the Tulsa County Treasurer should refund Shadybrook $41,184.00 for tax year 2004, $39,514.00 for tax year 2005, and $33,452.00 for tax year 2006. Neither party has suggested that the trial court's calculations were incorrect.

**23.** In *London Square Village*, the plaintiff was a not-for-profit corporation whose purpose was to provide housing for low and moderate income families. *London Square Village*, 1976 OK 159, ¶ 2, 559 P.2d at 1224. Through federally guaranteed loans, the London Square Village apartment complex was constructed to provide such low-income housing. Apartments in the complex were rented to all members of the public, and all renters, rich and poor alike, were required to pay rent. *Id.* ¶ 12, 559 P.2d at 1226.

Renters could apply to HUD for rent supplements, and those supplements were granted on the basis of an applicant's ability to pay. *Id.* Renters who were eligible to receive rent supplements under HUD standards included the elderly, physically handicapped, persons displaced from their homes by urban renewal or disaster, and military personnel on active duty. *Id.* London Square Village collected rent from

each tenant less the amount of supplement received from HUD. From those payments, the complex paid operating expenses and mortgage payments. This Court held that the London Square Village apartment complex was not exempt from ad valorem taxes because although low-income housing for such persons "was a worthwhile cause of beneficial interest to society," the apartment complex was not used exclusively for charitable purposes *when each and every occupant was required to pay for accommodations. Id.*

**24.** The statute at issue in *London Square Village*, 68 O.S.1971 § 2405, was the precursor to the statute at issue in this case.

**25.** In 2001, § 2887(8) was amended again. The amendment divided the existing paragraph 8 into an introductory paragraph and subparagraphs (a) and (b). It provided:

> The following property shall be exempt from ad valorem taxation:
>
> . . . .
>
> 8. All property of any charitable institution organized or chartered under the laws of this state as a nonprofit or charitable institution,

¶ 27 Revenue Procedure 96–32 sets forth a safe harbor under which organizations that provide low-income housing will be considered charitable. It provides objective income and occupancy requirements, and those organizations that meet the objective criteria are considered to have a charitable purpose under the Internal Revenue Code. The Internal Revenue Code defines charitable as:

*Relief of the poor and distressed or of the underprivileged;* advancement of religion; advancement of education or science; erection or maintenance of public buildings, monuments, or works; *lessening of the burdens of Government;* and promotion of social welfare by organizations designed to accomplish any of the above purposes, or (i) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimination; (iii) to defend human and civil rights secured by law; or (iv) to combat community deterioration and juvenile delinquency.

26 C.F.R. § 1.501(c)(3)–1(d)(2) (2012) (emphasis added).[26]

¶ 28 Before the most recent amendment to 68 O.S. § 2887 in 2003, most low-income housing complexes were exempt from ad valorem taxation in Oklahoma so long as they satisfied the requirements of Revenue Procedure 96–32 and other statutory requirements. The holding in *London Square Village* essentially became obsolete as most assessors looked to 68 O.S. § 2887(8) and Revenue Procedure 96–32 to decide if a housing complex was exempt. In fact, the Assessor treated Shadybrook as a charitable organization and exempted it from ad valorem taxes from 1998–2003.

¶ 29 In 2003, the legislature again amended 68 O.S. § 2887(8). The amendment prevented complexes improved or acquired with proceeds from the sale of federally tax-exempt bonds from receiving the ad valorem tax exemption. While the amendment put Shadybrook back on the county tax rolls because it was acquired with proceeds from the sale of federally tax-exempt bonds, Shadybrook continued to provide beneficial social services to its elderly and disabled tenants that relieved the state of burdens it might otherwise have to bear.[27] Likewise, it continued to qualify as a charitable organization under Revenue Procedure 96–32.

▬▬▬ ¶ 30 Courts must "recognize that the concept of charity evolves over time to take into account the changing needs of society, new discoveries, and the varying conditions, characters, and needs of different communities."[28] What qualifies as an exclusively charitable purpose is "'subject to

---

... and which includes but is not limited to an institution that either:
a. additionally satisfies the income standards set forth in Internal Revenue Service Revenue Procedure 96–32 if the property provides residential rental accommodations regardless of whether services or meals are provided, or
b. is a continuum of care retirement community providing housing for the aged, licensed under Oklahoma law, owned by a nonprofit entity recognized by the Internal Revenue Service as a § 501(c)(3) tax-exempt entity and located in a county with a population of more than five hundred thousand (500,000) according the latest Federal Decennial Census. 68 O.S.2002 § 2887(8).
In 2003, § 2887(8) was again amended. This amendment provided the exception to the exemption that is at issue in this case. *See supra* n. 9. Although § 2887(8)(a)(2)(b) was amended in 2010 to include "Except as provided in Section 178.6 of Title 60 of the Oklahoma Statutes," the exception to the exemption remains.

**26.** This definition of charitable is consistent with this Court's most recent discussion in *Integris* of the charitable use exemption. There we stated that "charitable institutions ... provide services

which *relieve the State of burdens which it would otherwise have to bear.*" *Integris*, 2002 OK 85, ¶ 12, 58 P.3d at 205 (emphasis added).

**27.** For example, Shadybrook received and administered a federal grant to pay for a Service Coordinator who assessed, evaluated, and resolved any physical or emotional needs of the tenants. If necessary, Shadybrook worked with the tenants' grown children to advise them of any abnormal behavior exhibited by the adult parent. Shadybrook also helped tenants receive medical, eye, and dental services, arranged for $1.00 telephone services for the tenants, held programs four times per month addressing fire protection, health issues, and security, and arranged transportation for the tenants to do their grocery shopping. Shadybrook provided these services to its tenants regardless of whether a tenant could pay his or her rent. Shadybrook managed to provide these services while operating without a profit.

**28.** *Evelyn Brody, All Charities Are Property–Tax Exempt, But Some Charities Are More Exempt Than Others,* 44 New. Eng. L.Rev. 621, 635 (2010).

judgment in the light of changing community mores.' "[29] While Revenue Procedure 96–32 does not dictate whether a use is charitable under the Oklahoma Constitution, the Legislature's use of Revenue Procedure 96–32 to determine whether a complex is exempt from ad valorem taxation reflects the altered environment in Oklahoma since this Court's decision in *London Square Village*.[30] The definition of charitable in Revenue Procedure 96–32 is consistent with this Court's most recent discussion of charitable in *Integris*. As such, we overrule *London Square Village*. We are persuaded by the dissent in *London Square Village*, which recognized that "it is academic that charity is not confined to almsgiving or relief of poverty and distress but has a broader signification, embracing the improvement and happiness of man.... Although ... only families of low income may receive direct benefit from the housing project, all persons in the community benefit indirectly. Charity of this type tends to be of a most practical character." *London Square Village*, 1976 OK 159, 559 P.2d at 1227–28 (Doolin, J., dissenting ¶ 9).[31]

### 68 O.S. 2004 § 2887(8)(a)(2)(b) as Amended is Unconstitutional

¶ 31 Because Shadybrook has demonstrated that its property was used exclusively for charitable purposes under the Oklahoma Constitution, we agree with the trial court that the statute in question is unconstitutional to the extent it imposes stricter requirements for exemption from ad valorem taxation than those set by § 6. The constitutional ad valorem tax exemption is not conditioned

upon whether a property is purchased with proceeds from the sale of federally tax-exempt bonds. Rather, § 6 requires only that an entity be used exclusively for charitable purposes. Therefore, **the statutory language in** *68 O.S.2004 § 2887* **(8)(a)(2)(b)**[32] **excluding property funded with proceeds from the sale of federally tax-exempt bonds from ad valorem exemption is unconstitutional to the extent it creates a burden on entitlement to the § 6 exemption.**

### Conclusion

¶ 32 We find that Shadybrook has overcome its burden of proving the existence of an exemption and has demonstrated that its operation of the low-income housing complex was a charitable use entitling it to the ad valorem tax exemption in § 6. *London Square Village* is overruled. The statutory language in 68 O.S.2004 § 2887(8)(a)(2)(b) excluding property funded with proceeds from the sale of federally tax-exempt bonds from ad valorem exemption is unconstitutional. We affirm the trial court's order in all respects.

### AFFIRMED.

¶ 33 COLBERT, V.C.J., KAUGER, WATT, WINCHESTER, EDMONDSON, REIF, COMBS, GURICH, JJ. —concur.

¶ 34 TAYLOR, C.J.–dissents.

---

**29.** *Yorgason*, 714 P.2d at 656.

**30.** "Stare decisis should be more than a fine sounding phrase [and] a substantial departure from precedent can only be justified ... in the light of experience with the application of the rule to be abandoned or in the light of an altered historic environment." *GEICO v. Quine*, 2011 OK 88, n. 5, 264 P.3d 1245, 1249 n. 5 (citing *Phillips v. Okla. Tax Comm'n*, 1978 OK 34, ¶ 48, 577 P.2d 1278, 1285–1286 (citations omitted)).

**31.** Although the apartments at the London Square Village complex were rented to the elderly, physically handicapped, persons displaced from their homes by urban renewal or disaster, and military personnel on active duty and Shadybrook was rented primarily to elderly and disabled tenants, *see supra* ¶ 2, we find that finan-

cial ability to pay under HUD standards was the deciding criteria in both cases. Today's holding is not limited to subsidized low-income housing complexes rented primarily to the elderly and disabled.

**32.** [N]o asset consisting of a single-family or multi-family dwelling unit owned by an entity the property of which would otherwise be exempt pursuant to subparagraph a of this paragraph shall be exempt from ad valorem taxation if any such dwelling unit was improved with or acquired with any portion of proceeds from the sale of obligations issued by any entity organized pursuant to Section 176 of Title 60 of the Oklahoma Statutes if the interest income derived from such obligations is exempt from federal income tax.... 68 O.S.2004 § 2887(8)(a)(2)(b).